[S.F. No. 23641. Sept. 28, 1978.]

DOUGLAS C. HALE, Plaintiff and Respondent, v.
JACK MORGAN, Defendant and Appellant.

392

## COUNSEL

Ralph E. Kingston for Defendant and Appellant.

Atwell & Henderson, Robert M. Henderson and Michael N. Atwell for Plaintiff and Respondent.

Felice A. Webster, Cary S. Reisman, Kenyon F. Dobberteen, Gilbert T. Graham, Steinhart, Goldberg, Feigenbaum & Ladar, John Curan Ladd, Peter W. Sly, Thomas W. Pulliam, Jr., and Andrea J. Saltzman as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**RICHARDSON, J.**—We consider constitutional challenges to Civil Code section 789.3, which assesses a penalty of $100 per day against a landlord who wilfully deprives his tenant of utility services for the purpose of evicting the tenant. We will conclude that the penalties provided by the section, while surviving an attack on the grounds of equal protection of the laws, may, under particular circumstances, violate the due process provisions of both the federal and our state Constitutions, and that the $17,300 sanction herein imposed was excessive. We will, accordingly, reverse the judgment and remand for the determination of a proper award. For purposes of retrial, we also examine an additional issue of statutory construction.

The parties do not dispute the existence of the events of 1975 which are critical to our determination. Defendant landlord, who lived in the San Francisco Bay Area, owned a mobile home park in South Lake Tahoe. In February, plaintiff, without defendant's knowledge or consent, moved his 35-foot mobile home into the park. The parties ultimately agreed orally to a rental space for $65 per month, which figure included water and garbage service but excluded electricity. For the next three months, plaintiff failed to pay any rent. In late May, defendant disconnected the water and electrical lines to the trailer. Thereafter until November, plaintiff lived, alternatively, in the mobile home and in his sister's residence.

In July, defendant filed a small claims action against plaintiff and recovered judgment for $495 in delinquent rent. At approximately the same time defendant removed the tires from plaintiff's vehicle. In August, plaintiff filed the present action for damages and statutory penalties, but defendant did not restore the utilities. Subsequently, defendant sued plaintiff for unlawful detainer, but the record is unclear as to whether a judgment was obtained in the action. In mid-November defendant returned the tires to the mobile home which plaintiff thereupon moved from the park.

In plaintiff's action, after trial the court found that defendant's termination of water and electrical services had been "willful," with the intent to evict plaintiff, and that plaintiff had been deprived of the utility services from May 26 to November 14, 1975, a total of 173 days. The court thereupon assessed penalties under section 789.3 in the sum of $17,300. Defendant appeals from the ensuing judgment.

The statute in question, section 789.3, enacted in 1971, provides: "(a) A landlord shall not with intent to terminate the occupancy under any lease or other tenancy or estate at will, however created, of property used by a tenant as his residence willfully cause, directly or indirectly, the interruption or termination of any utility service furnished the tenant, including, but not limited to water, heat, light, electricity, gas, telephone, elevator, or refrigeration, whether or not the utility service is under the control of the landlord. [¶] (b) Any landlord who violates this section shall be liable to the tenant in a civil action for all of the following: [¶] (1) Actual damages of the tenant. [¶] (2) One hundred dollars ($100) for each day or part thereof the tenant is deprived of utility service. [¶] (c) In any action under subdivision (b), the court shall award reasonable attorney's fees to the prevailing party."

## 1. WAIVER

■ Initially, we reject plaintiff's contention that, because the constitutionality of section 789.3 was unchallenged in the trial court, presentation of the issue for the first time on appeal is improper. While " 'It is the general rule applicable in civil cases that a constitutional question must be raised at the earliest opportunity or it will be considered as waived' " (*Jenner* v. *City Council* (1958) 164 Cal.App.2d 490, 498 [331 P.2d 176]), application of this principle is not automatic. Because the central issue before us is the propriety of very substantial *penalties* we interpret liberally defendant's attempts to raise error in a penal cotext. (Cf. *People* v. *Bolinski* (1968) 260 Cal.App.2d 705, 722 [67 Cal.Rptr. 347].) The record before us discloses that defendant urged before the trial court that enforcement of section 789.3 under the circumstances would be a "great injustice." We find at least arguable merit in defendant's assertion that constitutional issues were thereby adequately raised below.

Furthermore, even if the issue had not been properly presented to the trial court, we may nonetheless examine the validity of the statute under which penalties herein have been assessed. We have held that a litigant may raise for the first time on appeal a pure question of law which is presented by undisputed facts. (*Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534]; see also *California Sch. Employees Assn.* v. *Sunnyvale Elementary Sch. Dist.* (1973) 36 Cal.App.3d 46, 56 [111 Cal.Rptr. 433].) Moreover, although California authorities on the point are not uniform, our courts have several times examined constitutional issues raised for the first time on appeal, especially when the enforcement of a penal statute is involved (e.g., *People* v. *Allen* (1974) 41 Cal.App.3d 196, 201 [115 Cal.Rptr. 839]), the asserted error fundamentally affects the validity of the judgment (e.g., *People* v. *Norwood* (1972) 26 Cal.App.3d 148, 152-153 [103 Cal.Rptr. 7]), or important issues of public policy are at issue (e.g., *Bayside Timber Co.* v. *Board of Supervisors* (1971) 20 Cal.App.3d 1, 4-5 [97 Cal.Rptr. 431]).

In the case before us, defendant's challenge to a statute which is clearly penal presents a question of law directly addressed to the propriety of plaintiff's claim for relief. An important question of public interest is presented. Plaintiff, having been given full opportunity himself and through amici to support application of the statute as to him, does not allege that he will be prejudiced by our examination of defendant's contentions, the merits of which we now consider.

## 2. EQUAL PROTECTION

■ Arguing a violation of equal protection principles, defendant urges that the statute unfairly favors tenants over landlords. He notes that we have held that a landlord's material breach of the lease may justify a tenant in summarily withholding rent (see *Green* v. *Superior Court* (1974) 10 Cal.3d 616, 634-635 [111 Cal.Rptr. 704, 517 P.2d 1168]). Under section 789.3, in contrast, the landlord is compelled to retain a defaulting tenant, and to pay the tenant's utilities, until an unlawful detainer judgment can be obtained. Defendant describes this result as unequal protection.

However, guarantees of equal protection are not violated by the fact alone that a regulatory scheme treats one class of persons differently from another. ■ It is well established, for example, that where, as here, no "suspect" classification is involved and purely economic interests are at stake, the Legislature may impose any distinction between classes which bears some "rational relationship" to a conceivably legitimate state purpose. (*Reed* v. *Reed* (1971) 404 U.S. 71, 75-76 [30 L.Ed.2d 225, 229-230, 92 S.Ct. 251]; *McDonald* v. *Board of Election* (1969) 394 U.S. 802, 808-809 [22 L.Ed.2d 739, 745-746, 89 S.Ct. 1404]; *Brown* v. *Merlo* (1973) 8 Cal.3d 855, 861 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505]; *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487], vacated on other grounds (1971) 403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224].) The Legislature need not address all facets of a problem at once, or at all, but may deal with particular parties and issues in accordance with priorities satisfying to itself. (*Williamson* v. *Lee Optical Co.* (1955) 348 U.S. 483, 489 [99 L.Ed. 563, 573, 75 S.Ct. 461]; *West Coast Hotel Co.* v. *Parrish* (1937) 300 U.S. 379, 400 [81 L.Ed. 703, 713, 57 S.Ct. 578, 108 A.L.R. 1330]; see *Ferguson* v. *Skrupa* (1963) 372 U.S. 726, 732 [10 L.Ed.2d 93, 98, 83 S.Ct. 1028, 95 A.L.R.2d 1347].) ■ It is readily apparent that the dangers posed by utility deprivation as an eviction device are an appropriate subject of legislative attention and sanction.

Defendant also urges that, unless properly construed, the statute violates equal protection principles because it discriminates arbitrarily against two classes of *landlords*—those who know of section 789.3, and those who do not. Defendant's thesis is that no landlord who is aware of section 789.3 would dare violate it because the penalty is so severe. Thus in practical effect, it is argued, only landlords who are ignorant of the law are subject to its punishment, and this can serve no rational legislative purpose. ■ Defendant interprets the use of the adverb "willfully" in

section 789.3 as requiring that the landlord know that he is violating the law when he terminates the tenant's utilities; otherwise, he contends, the statute must fail on equal protection grounds.

We are unable to accept this analysis for several reasons. On its very face, section 789.3 makes no such distinction between "landlords." It applies to all of them and treats them equally. Further, a constitutional distinction between those persons who have actual knowledge of a law and those who do not, directly offends the fundamental principle that, in the absence of specific language to the contrary, ignorance of a law is not a defense to a charge of its violation. (*People* v. *O'Brien* (1892) 96 Cal. 171, 176 [31 P. 45]; *People* v. *Brocklehurst* (1971) 14 Cal.App.3d 473, 476 [92 Cal.Rptr. 340]; *People* v. *Evans* (1967) 249 Cal.App.2d 254, 260 [57 Cal.Rptr. 276]; *People* v. *Marschalk* (1962) 206 Cal.App.2d 346, 350 [23 Cal.Rptr. 743].) Speaking many years ago within a criminal context, we amplified the principle in this way: "It is an emphatic postulate of both civil and penal law that ignorance of a law is no excuse for a violation thereof. Of course it is based on a fiction, because no man can know all the law, but it is a maxim which the law itself does not permit any one to gainsay. . . . The rule rests on public necessity; the welfare of society and the safety of the state depend upon its enforcement. . . . [If permitted] the plea [of ignorance] would be universally made, and would lead to interminable questions incapable of solution. Was the defendant in fact ignorant of the law? Was his ignorance of the law excusable? The denser the ignorance the greater would be the exemption from liability. The absurdity of such a condition of the law is shown in the consummate satire of Pascal, where, speaking upon this subject, he says, in substance, that although the less a man thinks of the moral law the more culpable he is, yet under municipal law 'the more he relieves himself from a knowledge of his duty, the more approvedly is his duty performed.' " (*O'Brien, supra*, at p. 176.)

Moreover, it is well settled that the terms "willful" or "willfully," when applied in a penal statute, require only that the illegal act or omission occur "intentionally," without regard to motive or ignorance of the act's prohibited character. (Pen. Code, § 7, subd. 1; *In re Trombley* (1948) 31 Cal.2d 801, 807 [193 P.2d 734]; *People* v. *Gory* (1946) 28 Cal.2d 450, 458 [170 P.2d 433]; *People* v. *Mancha* (1974) 39 Cal.App.3d 703, 722 [114 Cal.Rptr. 392]; *Goodhew* v. *Industrial Acc. Com.* (1958) 157 Cal.App.2d 252, 257 [320 P.2d 515]; *Davis* v. *Morris* (1940) 37 Cal.App.2d 269, 274 [99 P.2d 345]; see *People* v. *Howard* (1969) 70 Cal.2d 618, 622 [75 Cal.Rptr.

761, 451 P.2d 401]; *Wilson* v. *Security-First Nat. Bank* (1948) 84 Cal.App.2d 427, 431 [190 P.2d 975].)

Defendant's citation to certain workers' compensation cases is unpersuasive. They involve general statutory proscriptions against "willful misconduct" or "serious and willful misconduct," and we have required actual knowledge of the probable *danger* posed by a deliberate act or omission as a precondition to employer liability. (See Lab. Code, § 4553.1; *Rogers Materials Co.* v. *Ind. Acc. Com.* (1965) 63 Cal.2d 717, 721-723 [48 Cal.Rptr. 129, 408 P.2d 737]; *Hatheway* v. *Industrial Acc. Com.* (1939) 13 Cal.2d 377, 380-381 [90 P.2d 68].)

Defendant's references to *Lambert* v. *California* (1957) 355 U.S. 225 [2 L.Ed.2d 228, 78 S.Ct. 240], and other federal criminal cases are not helpful to his position. In *Lambert,* a city ordinance requiring ex-felons who entered the city to register with the police department was held unconstitutional as applied to one who was ignorant of its provisions. The *Lambert* holding is expressly based on the fact that the ordinance there in question punished a passive, nonwilful *failure to act. (Id.,* at p. 228 [2 L.Ed.2d at p. 231].) Here, in contrast, we consider a statute punishing only the overt, affirmative act of terminating utilities with the specific intent to accomplish an unlawful objective.

We think that to require proof of the landlord's specific knowledge of the existence of section 789.3 would largely frustrate the legislative goal. A tenant could be assured of establishing a landlord's knowledge only by himself informing the landlord of the penalty in a manner calculated to satisfy a court of law. This would impose a difficult burden on an unsophisticated tenant charged with enforcing the statute.

█ We conclude from the foregoing that the Legislature's similar treatment of all landlords, the knowledgeable and the unknowing alike, is reasonable and does not offend constitutional guarantees of equal protection of the law.

3. DUE PROCESS

Defendant contends alternatively that the penalty herein imposed violates the due process clauses of the federal and state Constitutions. For reasons which we hereafter develop, we agree that section 789.3 permits the assessment of arbitrary, excessive and unreasonable penalties and that

the penalty sustained by defendant in this case exceeded constitutional limits.

■ In reaching these conclusions, we are guided by certain well settled principles. In the exercise of its police power a Legislature does not violate due process so long as an enactment is procedurally fair and reasonably related to a proper legislative goal. The wisdom of the legislation is not at issue in analyzing its constitutionality, and neither the availability of less drastic remedial alternatives nor the legislative failure to solve all related ills at once will invalidate a statute. (*Nebbia* v. *New York* (1934) 291 U.S. 502, 525 [78 L.Ed. 940, 949-950, 54 S.Ct. 505, 89 A.L.R. 1469]; *Seagram & Sons* v. *Hostetter* (1966) 384 U.S. 35, 47 [16 L.Ed.2d 336, 345, 86 S.Ct. 1254]; *Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 869 [76 Cal.Rptr. 642, 452 P.2d 930]; *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349, 359 [55 Cal.Rptr. 23, 420 P.2d 735].)

■ It is equally well accepted that a state may impose reasonable penalties as a means of securing obedience to statutes validly enacted under the police power. "There is no inhibition upon the state to impose such penalties for disregard of its police power as will insure prompt obedience to the requirements of such regulations." (*Shalz* v. *Union School Dist.* (1943) 58 Cal.App.2d 599, 606 [137 P.2d 762].) Imposition of civil penalties has, increasingly in modern times, become a means by which legislatures implement statutory policy.

■ The due process clauses, federal and state, are the most basic substantive checks on government's power to act unfairly or oppressively. As such, they protect against infringements by the state upon those "fundamental" rights "implicit in the concept of ordered liberty." (*Palko* v. *Connecticut* (1937) 302 U.S. 319, 325 [82 L.Ed. 288, 292, 58 S.Ct. 149].) The United States Supreme Court, on several occasions in recent years, has on due process grounds overturned legislation or disapproved governmental action which substantively invaded protected rights of the person. (E.g., *O'Connor* v. *Donaldson* (1975) 422 U.S. 563, 565-577 [45 L.Ed.2d 396, 401-408, 95 S.Ct. 2486] [confinement of nondangerous person for mental illness, without treatment, violates due process]; *Roe* v. *Wade* (1973) 410 U.S. 113, 153 [35 L.Ed.2d 147, 177, 93 S.Ct. 705] [state law prohibiting all nontherapeutic abortions violates the "concept of personal liberty" founded in the Fourteenth Amendment]; *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 484-485 [14 L.Ed.2d 510, 514-516, 85 S.Ct. 1678] [substantive right of privacy violated by prohibition on all

dissemination of contraceptive information].) The due process shield, while protecting life and liberty, of course, has similar application in the protection of property. Courts have consistently assumed that "oppressive" or "unreasonable" statutory penalties may be invalidated as violative of due process. (See, e.g., *People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 642 [268 P.2d 723].) We therefore examine section 789.3 to determine whether, either as enacted or as specifically applied (*Boddie* v. *Connecticut* (1971) 401 U.S. 371, 379-380 [28 L.Ed.2d 113, 119-121, 91 S.Ct. 780]), the penalties therein authorized are reasonable and proper or arbitrary and oppressive.

As previously noted, the section provides that, once the landlord has interrupted the tenant's utilities "willfully" and with intent to evict him, the landlord "shall" be liable to the tenant for both actual damages and a penalty of $100 for each day the tenant is "deprived" of service. (Civ. Code, § 789.3, subd. (b)(2).) It will thus be seen that the statutory penalty is mandatory in amount. Furthermore, and importantly, the duration of the penalties is potentially unlimited, even though the landlord has done nothing after the initial wrongful termination of utility service except fail to restore it.

No discretion is permitted the trier of fact in fixing the penalty. The acts prohibited by the section potentially encompass a broad range of culpable activity and conduct on the part of the landlord, and a widely divergent injury resulting in damage to the tenant. The fixed penalties are imposed upon potential defendants who may vary greatly in sophistication and financial strength. (Cf., *United States* v. *J. B. Williams Company, Inc.* (S.D.N.Y. 1973) 354 F.Supp. 521, 551.) These features of section 789.3 emphasize its substantial difference when compared, for example, with recently adopted federal statutes which require the consideration of various ameliorating factors in the assessment of proper civil penalties. (E.g., Federal Consumer Product Safety Act, 15 U.S.C.A. (Supp. II, 1972) § 2056 [size of business, gravity of violation]; Federal Trade Commission Act, 15 U.S.C.A. (Supp. V, 1975) § 45 (m)(1)(C) [degree of culpability, prior misconduct, ability to pay, effect on business "and such other matters as justice may require"].) No such moderating influences may be considered under section 789.3. A large corporate landlord which callously and by design pursues a policy of "shock" eviction suffers no greater penalty than the elderly widow of modest means who, dependent on the income from a single unit, ignorant of the penalty provisions of the law, exhausted by the machinations of a wily and recalcitrant tenant, and no longer willing or able to bear the expense of utilities for an occupant

who refuses to pay rent, finally terminates the tenant's utility services in order to speed his departure. We note that no distinction is made between the interruption of service of the vital essentials, water, heat, light, electricity and gas, and other services perhaps somewhat lower on the scale of necessities, namely, telephone, elevator, and refrigerator. In our view, a statute which applies such a mandatory, fixed, substantial and cumulative punitive sanction against persons of such disparate culpability is manifestly suspect.

We find it noteworthy that the sanction imposed by section 789.3 is potentially more severe than that provided by the Legislature for other more serious transgressions by the landlord against the tenant. For example, California law prohibits forcible entry by a landlord to regain possession of premises from a tenant. (Code Civ. Proc., § 1159.) Despite the fact that a physical, and perhaps violent, intrusion onto leased premises for purposes of recovery of possession may threaten a breach of the peace far more than does utility interruption, and can permanently and immediately deprive the tenant of possession, the punitive sanction for forcible entry is limited to a *discretionary* award *not to exceed* three times actual damages. (*Id.,* §§ 735, 1174.)

In a similar vein, a landlord is also statutorily prohibited from evicting a tenant as retaliation for certain actions taken by the tenant in defense of his rights. However, despite his wrongful motive for such evictions, the landlord is subject to no direct penalty, and the tenant may not raise retaliatory eviction as a legal defense more than once in any 12-month period. (Civ. Code, § 1942.5.)

Another of the landlord's basic obligations is the maintenance of the premises in habitable condition, and his failure in this regard may constitute a hazard to health and welfare fully as serious as that posed by utility interruption. However, in all cases save termination of utilities the tenant's remedy is limited to the "repair and deduct" provisions of Civil Code sections 1941-1942.1.

The wide disparity between legislative treatment of the foregoing violations, and that provided in section 789.3, strongly suggests that the latter may impose penalties which do not conform to the Legislature's own perception of the nature of the underlying offenses and of the remedies and appropriate sanctions necessary to achieve and preserve equitable landlord-tenant relations. In short, section 789.3 is wholly inconsistent with the statutory norm.

A review of other civil penalties provided by California law emphasizes the harsh impact, approaching confiscation, which is imposed by section 789.3. The monetary assessments for these other forms of civil misconduct are usually made discretionary in amount. Generally, they are also limited either to a fixed multiple of actual damages, to a specified total amount per "violation" or to a fixed duration. For example, a maximum of *treble* damages may be recovered by one denied his rights to fair credit (Civ. Code, §§ 1747.60, 1747.70, 1812.9), by a consumer when a manufacturer or retailer fails to comply with statutory warranties (*id.,* § 1794), by a utility which suffers malicious injury to its property (Pub. Util. Code, § 7951), or by one who suffers "wrongful" injury to his timber (Civ. Code, § 3346 [*double damages if the injury is "casual and involuntary"*]). A number of civil regulatory statutes carry a maximum "per violation" penalty. Examples include denial of civil rights through intimidation or violence, actual damages plus $10,000 (*id.,* § 52, subd. (b)); housing discrimination, actual damages plus up to $1,000 per violation (Health & Saf. Code, § 35738); discriminatory lending and "red lining" by institutional lenders, up to $1,000 per violation (*id.,* § 35822; see also Lab. Code, §§ 6427-6430; Bus. & Prof. Code, § 17536). One statute, Labor Code section 203, while imposing a daily penalty for a continuing failure to pay wages due at an employee's termination, nonetheless limits the penalty to 30 days.

In *People* v. *Western Air Lines, Inc., supra,* 42 Cal.2d 621, 627-628, we construed Public Utilities Code section 2107, which provides for penalties against a regulated public utility of $500-$2,000 per day for violation of the public utilities law or Public Utilities Commission orders. While we conceded that each day of overcharges by an airline constituted a separate violation of section 2107, and therefore upheld a penalty of $138,000 for 69 days of excessive charges, we also stressed the utility's ability, before the trial court, to show "factors in extenuation" of its action. (P. 642.)

Uniformly, we have looked with disfavor on ever-mounting penalties and have narrowly construed the statutes which either require or permit them. For example, in *People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30 [127 Cal.Rptr. 122, 544 P.2d 1322], we examined Water Code section 13350, subdivision (a), which exposes any person who intentionally or negligently causes or permits oil to be deposited on state waters in violation of water pollution standards, to a penalty of $6,000 "for each day in which such violation or deposit occurs." We rejected a contention that imposition of the statutory penalty continued for so long as the oil

spill remained on the water, holding, rather, that it could be assessed only for those days on which the process of *deposit* continued. (*Id.,* at pp. 42-44; compare Health & Saf. Code, § 42401 [up to $6,000 for each day in which air pollution standards are violated].)

Similarly, in *People* v. *Superior Court (Jayhill Corp.)* (1973) 9 Cal.3d 283, 288 [107 Cal.Rptr. 192, 507 P.2d 1400], we held that the "per-violation" penalty for false or deceptive advertising proscribed by Business and Professions Code section 17536 must be calculated on the basis of the number of persons to whom the alleged representations were made, rather than by the number of separately identifiable misrepresentations.

Finally, in *Walsh* v. *Kirby* (1974) 13 Cal.3d 95 [118 Cal.Rptr. 1, 529 P.2d 33], we recently concluded that the Department of Alcoholic Beverage Control could not, despite the literal terms of Business and Professions Code section 24755, secretly cumulate known liquor fair trade violations before filing an accusation in order to exact confiscatory penalties from a liquor retailer. We observed: "The department in the instant case has clearly acted in an excessive manner: first, by proceeding against the licensee in a way designed not to induce conformance with fair trade practices and, second, by imposing cumulative penalties which result in de facto revocation [of the retailer's liquor license] *and are excessive when measured against the licensee's conduct and the purposes sought to be achieved by the penalty provisions.*" (*Id.,* at pp. 103-104, italics added.) We concluded, therefore, that the department's actions in permitting cumulation of penalties had violated principles of due process.

Section 789.3 *requires* such cumulation; it measures penalties not on a "per-violation" basis, but strictly by the day, leaving little room for that form of narrow interpretation of the penalty's scope and reach, such as we applied in *Younger, Jayhill* and *Walsh.* The exercise of a reasoned discretion is replaced by an adding machine. The challenged statute mandates essentially that a single wrongful act by the landlord, if not corrected, will subject him to potentially infinite penalties, regardless of the circumstances of the violation, the offender, the victim or the damage caused. Unlike the environmental and public utility regulations discussed above, the section's impact extends beyond sizeable and well established business organizations to individuals of extremely modest means. Though the Legislature need not, of course, precisely adjust its regulatory efforts to ensure exact justice in every case, neither may it, in defiance of due process requirements, compel the exaction of penalties which, in a

particular case, demonstrably overbalance and outweigh reasonable goals of punishment, regulation and deterrence.

At least 14 other jurisdictions have enacted legislation which, in some form, prohibits the interruption of utility service by a landlord. (Alaska [Alaska Stats., §34.03.210]; Arizona [Ariz. Rev. Stat. Ann. § 33-1367]; Connecticut [Conn. Gen. Stat. (1977) § 47a-13]; Illinois [Ill.Rev.Stats., Ch. 23, § 11-23.1]; Kansas [Kan.Rev.Stat., § 58-2563]; Massachusetts [Mass. Ann. Laws (Michie's) (1978 Supp.) ch. 186, § 14]; Michigan [Mich.Stat. Ann. (1978 Supp.) § 27A.2918]; Minnesota [Minn.Stat.Ann. (1978 Supp.) § 504.26]; Nebraska (Neb.Rev.Stat. (1976 Supp.) § 76-1427]; New Mexico [N.M.Stat.Ann., § 70-7-36]; New York [Real Prop. Acts., § 756]; Texas [Vernon's Tex.Stat.Ann., art. 5236c];- Virginia [Va. Code (1977 Supp.) §§ 55-248.36, 55-248.40]; and Washington (Wash.Rev. Code Ann. (1976 Supp.) § 59.18.300].) It is significant, we think, that no other jurisdiction appears to impose a penalty so severe as that described in section 789.3.

One state, Washington, has adopted a statute whose language is similar to section 789.3, but imposition of the $100 per day penalty is made discretionary rather than mandatory. Most other jurisdictions limit penalties to a specified multiple of actual damages (Alaska, Minnesota), or of monthly rent (Texas), or permit the tenant to choose among alternative maximum awards based on rent, actual damages, or a specified statutory sum (Arizona, Connecticut, Kansas, Massachusetts, Michigan). Two states limit the award to "actual" damages, however measured (Nebraska, Virginia). Still others treat violations of their statutes as misdemeanors with discretionary penalties up to a specified maximum (Illinois [six months' confinement or $500 fine], Massachusetts [six months or fine of from $25 to $300]). New York's statute provides that rent will be abated until utilities are restored, and New Mexico's law includes no clearly delineated penalty for violation. These statutes reinforce our view that section 789.3 in its unlimited, "open ended" character compels penalties which, in particular circumstances, may clearly exceed any appropriate and proportionate sanction for wrongful utility termination.

Finally, we note that section 789.3 permits the occasional experienced and designing tenant to ambush an unknowing landlord converting the single wrongful act of the latter into a veritable financial bonanza. Such a tenant may readily choose to endure the undoubted hardship of no utility service in return for a sure and certain reward accumulating at $3,000 per

month; the size of the instant award demonstrates the potential for abuse. (Compare *People* ex rel. *Younger* v. *Superior Court, supra,* 16 Cal.3d 30, 42-44; *Walsh* v. *Kirby, supra,* 13 Cal.3d 95, 103-104.)

We note certain anomalous results from the application of section 789.3. When a landlord, eschewing his legal remedy quickly evicts a weak tenant by cutting utility service, his penalty will be less than when a stronger or more obstinate tenant resists and remains despite the deprivation. Such a result may well dilute the deterrent effect sought by the daily penalty. On the other hand, by failing to provide more precisely for the termination of penalties, the statute purports to allow monumental awards to accrue in cases where, as here, the landlord's attempt at extrajudicial eviction has proven utterly ineffectual.

■ In summary, operation of the penalty provided by section 789.3 is mandatory, mechanical, potentially limitless in its effect regardless of circumstance, and capable of serious abuse. Its severity appears to exceed that of sanctions imposed for other more serious civil violations in California and for similar prohibited acts in other jurisdictions. For all of the foregoing reasons in combination, we hold that section 789.3 may, under circumstances such as those herein presented, produce constitutionally excessive penalties.

We cannot conclude, however, that all applications of section 789.3's penalty formula would be unconstitutional. The imposition of the $100 daily penalty over a limited period may indeed, in a given case, be a perfectly legitimate means of encouraging compliance with law. Furthermore, there are doubtless some situations in which very large punitive assessments are both proportioned to the landlord's misconduct and necessary to achieve the penalty's deterrent purposes.

Where, as here, a penal statute may be subject to both constitutional and unconstitutional applications, courts evaluate the propriety of the sanction on a case-by-case basis. We have said that a statute is presumed to be constitutional and that it must be upheld unless its unconstitutionality "clearly, positively and unmistakably appears." (*In re Dennis M.* (1969) 70 Cal.2d 444, 453 [75 Cal.Rptr. 1, 450 P.2d 296]; *Lockheed Airport Corp.* v. *Superior Court* (1946) 28 Cal.2d 481, 484 [171 P.2d 21, 166 A.L.R. 701].) ■ Was the application of section 789.3 to the present case and the assessment of a penalty of $17,300 against defendant for his conduct "clearly, positively, and unmistakably" unconstitutional? We hold that it was.

Defendant, a cable television installer, lives in Daly City. He purchased the South Lake Tahoe trailer park a little more than a year before the occurrence of the events here at issue. At the time of purchase there were no more than four or five mobile homes on the premises. Defendant personally managed the park, and maintained no employees there. These facts suggest a modest operation by a relatively unsophisticated landlord.

As previously noted, defendant's response to plaintiff's failure to pay rent was hardly exemplary. His conduct, while doubtless provoked, is subject to censure and justifies sanctions.

We are of the view, however, that under all of the circumstances of this case the *amount* of the penalties is constitutionally excessive. The monthly rental for plaintiff's trailer space was $65, or $780 for a year. The cumulation of penalties under the statute would have been $36,500 for one year. Almost one-half of this amount, or $17,300, was actually imposed against defendant. While the record does not disclose the purchase price of the park, it is not inconceivable that though plaintiff's initial entry may have constituted a trespass, and though it was subsequently determined judicially that he breached his rental contract, he may well end up owning the park or a substantial equity therein as a consequence of the application of section 789.3 to defendant's conduct. Such a confiscatory result is wholly disproportionate to any discernible and legitimate legislative goal, and is so clearly unfair that it cannot be sustained. We must therefore reverse the judgment.

### 4. CONSTRUCTION OF "DEPRIVED"

For the guidance of the trial court in the event of retrial, we consider a final issue of statutory interpretation. Subdivision (b)(2) of section 789.3 measures the penalties to be assessed for every day in which the tenant is "deprived" of utility service. Numerous circumstances may attend the landlord's interruption of utility services. When may it fairly be said that the tenant is "deprived" of such service?

Because the statute is penal, we adopt the narrowest construction of its penalty clause to which it is reasonably susceptible in the light of its legislative purpose. (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420]; *Walsh* v. *Dept. Alcoholic Bev. Control* (1963) 59 Cal.2d 757, 764 [31 Cal.Rptr. 297, 382 P.2d 337]; see *Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 488 [134 Cal.Rptr. 630, 556 P.2d 1081]; but see Pen. Code, § 4; *People* v. *Van*

*Alstyne* (1975) 46 Cal.App.3d 900, 912, fn. 10 [121 Cal.Rptr. 363], cert. den. (1976) 423 U.S. 1060 [46 L.Ed.2d 652, 96 S.Ct. 798]; cf. *Mourning* v. *Family Publications Service, Inc.* (1973) 411 U.S. 356, 374-375 [36 L.Ed.2d 318, 332-333, 93 S.Ct. 1652].)

Webster's Third New International Dictionary (1961) defines "deprive" as: "(2) a. to take something away from: . . . (3) to keep from the possession, enjoyment or use of something." It seems clear that the landlord "takes [utility services] . . . away from" a tenant when he interrupts those services. It is not as clear, however, under what circumstances the landlord may be deemed to be "keep[ing] [the tenant] from the possession, enjoyment or use" of utilities.

We think the connotation of the term, in its common usage, is that one who "deprives" another of something must be capable of preventing the latter from having access to it. Thus, if a person is without any reasonable, practical means of obtaining the thing withheld, and therefore is insulated from its benefits, he may be considered "deprived."

We therefore conclude that, within the context of the issue herein presented, statutory penalties accrue so long, but only so long, as the tenant lacks practical access to any residential utility because the landlord has terminated service. If, for example, the tenant actually succeeds in restoring service, or, by reasonable effort, could have done so, he cannot thereafter be considered to have been "deprived" of it.

Moreover, if the tenant abandons the premises permanently for other lodging, or, for reasons unrelated to the utility termination, is absent for substantial periods so as to suggest that he has established another residence during such period, the landlord's conduct can hardly be said to have "deprived" the tenant of service at premises which the tenant is "us[ing] as his residence." (See § 789.3, subd. (a).) Finally, of course, once the tenant has been lawfully evicted or barred from possession by legal process no statutory purpose would be served by the continued accrual of the daily penalty.

Here, the record demonstrates that water and electricity to plaintiff's trailer were disconnected by the landlord, and that no service was available from May 26, 1975, to November 14, 1975. Defendant testified that, in disconnecting the electricity, he removed a special adapter without which it was not possible for a trailer to "plug in" to the park's power supply. Defendant further declared that his own well was the

source of the trailer park's water supply, and that he shut off and capped the pipe leading to plaintiff's trailer. We must therefore conclude as a matter of law, that, under these particular circumstances, plaintiff had no reasonable means of restoring service on his own initiative.

The record does not disclose how many days plaintiff was actually residing in the premises during the period in question. Plaintiff testified, at one point, that from June 1975 on he resided more or less constantly with his sister because the utility termination made the trailer unlivable. At another point in his testimony he suggested that he continued living in the mobile home until August, when, after defendant had removed its tires, an earthquake knocked it over. Plaintiff's sister testified that he continued to live in the vehicle, and that she visited him there often. The trial court made no findings as to the frequency, duration and causes of plaintiff's absences from his mobile home. On any retrial, the court should, in the course of determining a proper penalty under the circumstances of this case, consider the extent to which plaintiff was "deprived" of utility service.

We, of course, possess neither the power nor the inclination to attempt to amend a legislative enactment, our responsibility being limited to determining the statute's meaning and validity. Any appropriate changes rest exclusively in legislative hands.

The judgment is reversed and the cause is remanded to the trial court for retrial on the issue of the appropriate penalty only, consistent with the views expressed in this opinion.

Bird, C. J., Tobriner, J., Mosk, J., Clark, J., and Manuel, J., concurred.

NEWMAN, J., Concurring.—Article I, section 17 of the California Constitution commands that "excessive fines" not be imposed. In my view those two words justify reversal of the judgment here. There is ample reason for concluding that the constitutional prohibition covers civil as well as criminal fines.

I do not read the opinions cited by the majority here (e.g., *Western Air Lines, Younger, Jayhill,* and *Walsh*) as harbingers of a disinterred substantive-due-process review. Because of article I, section 17 of the California Constitution such a review indeed seems inappropriate in this case. Since 1937 "the [United States Supreme] Court's abandonment of

'substantive due process' review over economic regulation has been constant and unequivocal." Freund et al., Constitutional Law (4th ed. 1977) page 1094.