[No. B077219. Second Dist., Div. One. Apr. 4, 1994.]

WOODLINE FURNITURE MFG. CO., INC., Plaintiff and Appellant, v. DEPARTMENT OF INDUSTRIAL RELATIONS, DIVISION OF LABOR STANDARDS ENFORCEMENT, Defendant and Respondent.

COUNSEL

Willard D. Horwich and David J. Wilzig for Plaintiff and Appellant.

H. Thomas Cadell, Jr., and Anne Stevason for Defendant and Respondent.

OPINION

**VOGEL (Miriam A.), J.**—An employer, cited at noon for a failure to have workers' compensation insurance coverage for its employees, complains that the statutory penalty should not have been imposed because, later the same day, a policy was finally obtained. We disagree.

### FACTS

Woodline Furniture Mfg. Co., Inc., which is owned by Yan Kats and his family, employs 131 people to manufacture oak furniture and upholstered chairs, to assemble furniture manufactured by others, and to handle ancillary clerical work. Until May 1992, Woodline's workers' compensation insurance was provided by Pacific Rim Assurance Company.[1] In early 1992, however, a dispute arose about Woodline's failure to pay premiums which Pacific Rim claimed were due and on May 2, 1992, Pacific Rim cancelled Woodline's coverage. Although Woodline made some efforts to obtain replacement insurance, it is undisputed that it remained uninsured for over six months, from May 3 through November 5.[2] On November 25, State Fund issued a policy to Woodline, with an effective date of November 6, at 5:00 p.m.

---

[1]Every California employer which is not permissibly self-insured must carry workers' compensation insurance. (Lab. Code, § 3700.) Unless otherwise stated, all section references are to the Labor Code.

[2]Although Woodline claims it "diligently and timely sought replacement coverage," the record suggests otherwise. It was not until June 6 that Kats contacted "an insurance person" to inquire about coverage through the State Compensation Insurance Fund and it was not until June 18 that Kats finally submitted an application to the State Fund—and that application was woefully incomplete. For example, Kats listed four categories of employees but failed to answer questions about the number of employees and estimated annual payroll for each category. State Fund had to twice ask for those numbers and for other missing information, including Woodline's corporate records, business license number, loss history for the years 1987 through 1991, and so on. Although the record does not disclose when State Fund finally

Meanwhile, at 11:00 a.m. on November 6, Dennis Daily, an investigator with the Division of Labor Standards of the California Department of Industrial Relations, and Ed Sasaki, an auditor with the California Employment Development Department, went to Woodline for reasons unrelated to Woodline's compensation coverage. While he was there, Daily asked Kats for evidence of Woodline's workers' compensation coverage (as is standard practice whenever anyone from the Division of Labor Standards visits an employer for any reason). Kats said he had applied to State Fund for insurance but admitted he did not, at that moment, have coverage. As required by statute, Daily immediately issued a stop order (§ 3710.1) and a penalty assessment in the amount of $100,000, the maximum allowable under section 3722.[3] The amount of the penalty was based on a computer printout provided by Kats, showing 131 employees on Woodline's payroll at that time.

While Daily was still on the premises, Kats telephoned State Fund to determine the status of his application. Before he left, Daily took the phone and gave the State Fund representative his Fax number, so that State Fund could transmit evidence of insurance if a binder was issued later that day (in which event Daily would lift the stop order and Woodline's employees could resume work). After Daily left, Kats had a $20,000 cashier's check delivered to State Fund and obtained telephone or Fax confirmation sufficient to satisfy Daily that State Fund had agreed to issue a policy which, in turn, permitted Daily to lift the stop order—but not the penalty. On November 25, State Fund issued Woodline's policy, effective as of 5 p.m. on November 6. On December 7, State Fund issued an endorsement, changing the effective time of the policy from 5 p.m. to 12:01 a.m. on November 6. While the endorsement provided retroactive coverage for the hours preceding and including the time of Daily's November 6 visit to Woodline, it did not cover

received the final bit of missing information, it is clear that it wasn't until sometime after August 17. Insofar as Pacific Rim is concerned, the record discloses that during this same period Woodline attempted to resolve the dispute about how much was owed and by whom—but the only reference to replacing the cancelled insurance policy appears at the end of a June 24 memo from Woodline's agent to Pacific Rim: "Assuming Mr. Kats pays off the final audit, what will it take to have you re-instate [*sic*] the policy?"

[3]Under section 3710.1, when an employer has failed to secure the coverage required by section 3700, a stop order must issue to prohibit the use of employee labor until the employer obtains insurance. The stop order is effective immediately upon service. Under subdivision (a) of section 3722, at the same time a stop order issues pursuant to section 3710.1, a "penalty assessment order" must also be issued and served, requiring the uninsured employer to pay into the Uninsured Employers Fund the sum of $1,000 "per employee employed at the time the order is issued and served, as an additional penalty for being uninsured *at that time*." (Italics added.) Subdivision (d) of section 3722 sets the maximum penalty at $100,000.

or have any effect on the preceding six-month period during which Woodline was uninsured (May 3 through November 5).[4]

In response to Woodline's request to the Director of Industrial Relations (the executive officer in control of the Department of Industrial Relations), a hearing was held on January 19, 1993, to consider Woodline's objection to the $100,000 penalty. (§§ 51, 3725, 3727.1.) Kats, Daily and Sasaki testified before a hearing officer who thereafter found that Woodline had no workers' compensation insurance in effect at the time of Daily's November 6 visit; that State Fund insurance was obtained later that day; that Kats gave Daily a computer printout showing a total of 131 employees on the payroll as of November 6; and that Sasaki had counted approximately 80 employees actually on the premises during the morning hours of November 6. The hearing officer upheld the $100,000 penalty assessment, concluding the number of employees was properly determined by the information provided by Kats, not by Sasaki's head count.

Woodline filed a petition for a writ of mandate, asking the trial court to set aside the penalty. The trial court denied the petition and Woodline appeals from the judgment thereafter entered.

DISCUSSION

I.

Woodline contends the December 7 endorsement (making the State Fund policy effective as of 12:01 a.m. on November 6) relates back to November 6 and that, therefore, the penalty should not have been imposed because Woodline was insured on November 6. We disagree.

Under the plain language of the statute, the monetary penalty must be imposed at the time the stop order is issued, "as an additional penalty *for being uninsured at that time*." (§ 3722, subd. (a), italics added; see also § 3710.1 [the stop order, which is the condition precedent to the monetary

---

[4]Under section 460 of the Insurance Code, "every printed form of insurance contract" is supposed to state an inception hour of 12:01 a.m. of the date upon which it is to be dated. We cannot determine from the record whether the December 7 endorsement was initiated by State Fund to conform to the Insurance Code or whether it resulted from Woodline's efforts to set the stage for its attack on the penalty. For this reason, we summarily reject Woodline's suggestion that the issuance of the endorsement by State Fund (which is one of six divisions of the Department of Industrial Relations) somehow estops the Division of Labor Standards Enforcement (which is also a division of the Department of Industrial Relations) from ignoring the endorsement for purposes of enforcing the penalty. (§§ 50, 56, 61; Ins. Code, § 11775.)

penalty, "shall become effective immediately upon service"].) At the time Daily issued the stop order, Woodline was uninsured—and the subsequently issued endorsement is therefore irrelevant. If the Legislature wanted to permit an employer to avoid a penalty by obtaining retroactive insurance after issuance of a stop order, it would have said so. But it did not, and it is not our function to read into the statute a provision which is not there and which we do not believe the Legislature intended. (*In re DeLonnie S.* (1992) 9 Cal.App.4th 1109, 1114 [12 Cal.Rptr.2d 43]; *Donald Schriver, Inc.* v. *Fair Employment & Housing Com.* (1986) 220 Cal.App.3d 396, 409-410 [230 Cal.Rptr. 620].) Furthermore, there are several additional reasons for rejecting Woodline's argument.

First, the fact that the effective date of an insurance policy is determined by the parties and can, by agreement, be any date before, at the time of, or after the delivery of the policy (12A Appleman, Insurance Law and Practice (1981) Duration of Risk, § 7171, pp. 1-2), has absolutely nothing to do with a statutory penalty imposed at a time when there was, in fact, no coverage.

Second, acceptance of Woodline's position would encourage noncompliance with the statute. If retroactive coverage could absolve an employer of responsibility for a previously imposed penalty, employers would have no reason to purchase insurance until their failure to comply with the law was fortuitously discovered and a penalty was imposed.

Third, Woodline's arguments conveniently ignore the fact that the retroactivity endorsement is for 17 hours (the period between 12:01 a.m. and 5 p.m. on November 6), not for the six months Woodline failed to provide coverage for its employees. From an equitable perspective, this would be a different case if there was anything in the record to suggest Woodline had at least tried to obtain retroactive coverage for the six months it was uninsured. As it stands, however, we have no need to decide whether we could base our decision on equitable considerations—Woodline's failure to do equity resolves the issue in favor of the Division of Labor Standards.[5] (*Ephraim* v. *Metropolitan Trust Co.* (1946) 28 Cal.2d 824, 837 [172 P.2d 501] [he who seeks equity must do equity].)

Fourth, the amount of the penalty imposed in this instance is roughly equal to the amount Woodline would have paid for coverage during the six months it was uninsured. When the State Fund policy issued, the estimated

---

[5]Obviously, our decision is based upon the facts before us and we express no opinion about whether the result ought to be the same where, by reason of a retroactive policy, coverage is obtained for the entire period during which an employer was uninsured.

annual premium was over $195,000—which means a fine for half that amount is perfect justice. (See also §§ 3715, 3716, 3722, subd. (a) [claims by employees injured while working for an uninsured employer are paid, in most instances, by the Uninsured Employers Fund and the $100,000 penalty imposed on Woodline was or will be deposited into that Fund].)[6]

■ Fifth and finally, we must consider the several purposes of the Workers' Compensation Act—"(1) to ensure that the cost of industrial injuries will be part of the cost of goods rather than a burden on society, (2) to guarantee prompt, limited compensation for an employee's work injuries, regardless of fault, as an inevitable cost of production, (3) to spur increased industrial safety, and (4) in return, to insulate the employer from tort liability for his employees' injuries." (*S. G. Borello & Sons, Inc.* v. *Department of Industrial Relations* (1989) 48 Cal.3d 341, 354 [256 Cal.Rptr. 543, 769 P.2d 399]; see also Herlick, Cal. Workers' Compensation Handbook (12th ed. 1993) p. viii.) To these ends, section 3202 directs the courts to liberally construe the Workers' Compensation Act "with the purpose of extending [its] benefits for the protection of persons injured in the course of their employment." ■ To relieve Woodline of its liability for the penalty imposed in this case would not further any purpose of the Act; to the contrary, it would permit Woodline to escape its responsibility for the premiums it should have paid for the six months it was uninsured as well as its responsibility for the penalty properly imposed. That is not an appropriate result.

## II.

Woodline's remaining contentions are subject to summary disposition.

■ First, we reject Woodline's contention that the penalty should have been based on 80 employees (per Sasaki's head count), not on 131 (per Kats's computer printout), and thus set at $80,000, not the maximum $100,000. The statute fixes the penalty at $1,000 "per employee employed at the time the order is issued and served" (§ 3722, subd. (a)), not on the number of people present at the time the penalty assessment is imposed. Woodline's own records showed there were 131 employees "employed at the time the order [was] issued and served." No more need be said.

---

[6]An injured employee of an uninsured employer may bring a personal injury action while at the same time pursuing workers' compensation benefits by an application to the Workers' Compensation Appeals Board for payment by the Uninsured Employers Fund. (§§ 3706, 3715, 3716.) Winning a lawsuit is not a particularly meaningful victory if the employer is unable to respond in damages, and we would venture a guess that an employer unable or unwilling to provide workers' compensation insurance is more often than not unable to pay damages.

■ Second, we reject Woodline's contention that the penalty ought to be set aside because it had done everything it could to obtain coverage, and it was merely through "an unfortunate coincidence" that Daily visited Woodline on November 6. As explained above (fn. 2, *ante*), Woodline was anything but diligent. Although the Pacific Rim policy was cancelled on May 2, it was not until June 18 that Woodline submitted an application to State Fund, and the application it submitted was wholly inadequate. Furthermore, the claim of "unfortunate coincidence" overlooks the fact that the same penalty could have been imposed on any day during the preceding six-month period.

■ Third, we reject Woodline's contention that the penalty is so great as to constitute a violation of its due process rights. Woodline's assertion that a penal statute will be narrowly construed in light of its legislative intent (*Hale v. Morgan* (1978) 22 Cal.3d 388, 399 [149 Cal.Rptr. 375, 584 P.2d 512]) ignores the legislative intent of the Workers' Compensation Act explained above. Woodline's claim that a small business may not be able to survive a substantial penalty ignores the fact that the penalty is no greater than the amount Woodline would have paid for coverage for the six months it was uninsured—and also ignores the fact that an injured employee denied immediate access to no-fault compensation because an employer has violated the law may not be able to survive. In the scheme of things, the penalty fits the crime and there is no due process violation.[7]

DISPOSITION

The judgment is affirmed.

Spencer, P. J., and Ortega, J., concurred.

---

[7]We also reject the Division of Labor Standards' suggestion that Woodline's writ petition was improperly considered by the trial court because Woodline failed to post the bond required by section 3725 (when the Director of Industrial Relations refuses to set aside a penalty, the employer may file a petition for a writ of mandate in superior court "upon the execution by the party assessed of a bond to the state in double the amount found due and ordered paid by the director"). As permitted by section 995.240 of the Code of Civil Procedure, Woodline filed an application for relief from the bonding requirement. Although the trial court did not sign an order declaring Woodline indigent, the court did reach the merits of Woodline's claims, thereby effectively exercising its discretion to grant the requested relief. Under the circumstances, we find no abuse of discretion.