Filed 6/30/22  In re Ar.P. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| In re Ar.P., A Person Coming Under the Juvenile Court Law. | B314224 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>P.P.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 18CCJP01447) |

APPEAL from an order of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

P.P. (Father) appeals various orders of the juvenile court in dependency proceedings regarding his son, Ar.P. On appeal, Father argues for the first time that the juvenile court should not have terminated those proceedings. He contends that Father and Ar.P. were making progress toward repairing their damaged relationship, that terminating juvenile court jurisdiction will threaten that progress, and thus that continuing jurisdiction would have been in Ar.P.'s best interests. Even if we broadly construe Ar.P.'s notice of appeal as identifying the order terminating juvenile court jurisdiction, Father failed to object to the termination of juvenile court jurisdiction below, and has thus forfeited the argument. Accordingly, we affirm.[1]

## FACTS AND PROCEEDINGS BELOW

The instant dependency proceedings began in 2018 when the juvenile court took jurisdiction over Ar.P. and his brother, Father's now-adult son A.P., based on "Father's history of volatile and aggressive conduct and because Father threatened to harm A.P. with a baseball bat."[2] The baseball bat incident resulted in a criminal restraining order against Father and a conviction for "threaten[ing] to use force on a person ([c]hild [a]buse)."

"[T]he petition also alleged that the children did not want to visit" Father, who lived separately from the mother. The children continued to refuse contact with Father during the first

---

[1] We resolve this case by a memorandum opinion pursuant to California Standards of Judicial Administration, section 8.1. Accordingly, we include a minimal summary of the factual and procedural background.

[2] The children are prior dependents of the court based on domestic violence between the parents.

2

approximately two years of the dependency proceedings. Their therapist also reported they were not ready to begin such visits.

Father participated and made progress in services during this time, but also violated the criminal protective order in September 2019, resulting in a misdemeanor conviction. The children's therapist reported both children suffered from anxiety and post-traumatic stress disorder (PTSD) as a result of the way Father had treated them.

In orders that were the subject of an earlier appeal, the juvenile court terminated jurisdiction, granted the mother sole physical custody, and awarded Father visitation to the extent that the children were willing to participate. (See *In re A.P. et al.* (Apr. 1, 2020, B299536) [nonpub. opn.].) In an unpublished opinion, we vacated those orders and instructed the juvenile court on remand to conduct further proceedings "to determine whether jurisdiction should be continued, and to formulate a new visitation order that does not give the children or their therapist authority to determine visitation." (See *ibid.*)

The juvenile court did so. At the outset of the proceedings following remand, the Los Angeles County Department of Children and Family Services (DCFS) reported that the children continued to refuse to have contact with Father based on his past behavior. The therapist did not believe the case being reactivated was "in any way beneficial to the [P.] boys" but instead "it [was] entirely for the benefit of . . . [F]ather, who had lost his parental visitation rights due to being violent and threatening to the whole family."

The court nevertheless ordered the children to participate in monitored visitation with Father in a virtual therapeutic setting. The children's individual therapy and conjoint therapy

3

with Father was to be provided by a new therapist, Tom Echlin, based on Father's concerns about the previous therapist. Echlin began virtual conjoint sessions with Father and Ar.P. that initially seemed promising, and Echlin initially noted "no evidence of a reoccurrence of [the] somatic symptoms of anxiety" Ar.P. had previously been experiencing, suggesting Ar.P. "fe[lt] safe and [was] tolerating the process." The treatment plan had to be modified, however—and Echlin's conjoint sessions with Ar.P. and Father discontinued—due to Father's aggressive and hostile conduct. Specifically, in November 2020, the therapist indicated that " 'there are significant deficits in [Father's] capacity for anger management, an inability to recognize the impact of his actions, a tendency towards emotional dysregulation, and an authoritarian parenting style.' "

Pursuant to the revised treatment plan, Ar.P. continued to participate in individual counseling sessions with Echlin, and Father resumed anger management sessions with a different therapist.

In October 2020, a court-ordered psychological evaluation of Father was completed and reported, "[Father] scored in the significantly elevated range on MCMI-IV [s]cales labeled *Histrionic, Turbulent, Narcissistic and Sadistic*." The evaluation further concluded Ar.P.'s resistance to visits with Father stemmed from realistic concerns about Father's long-standing behavior. It recommended that "therapy services implemented to renew contact between [Ar.P.] and his father . . . should be limited to [no] more than [six] months, and that if no movement toward renewal of visitation is created through therapy, visits by the father should be ordered terminated."

In December 2020, Echlin reported Ar.P. would be ready to restart conjoint sessions with Father once Father's therapist determined Father had met his therapeutic goals. No such determination appears in the record. To the contrary, as of April 2021, Echlin reported that Father still needed to successfully complete focused anger management therapy before proceeding to the next phase of the reunification efforts. Father's therapist also reported her "reservations regarding [Father's] progress to goals" and "recommend[ed] [Father] continue in treatment to support and maintain progress toward current goals." Also in April 2021, the criminal court found Father in violation of his probation for failing to obey the criminal protective order, reinstated probation, and ordered Father to complete additional anger management courses. Finally, although Father had completed his domestic violence program, a staff member at the program indicated she was "[n]ot sure if [Father] is taking full responsibility for his actions."

Around this same time, Ar.P. expressed a desire to reunite with Father "on [Ar.P.'s] terms—not by court order." Echlin interpreted this as "actual evidence (at least in child centered psychotherapeutic terms) of . . . [Ar.P.'s] 'nascent desire' for a parental connection." He further noted: "[I]t is possible that [Father] could be deemed ready for monitored interactions with the minor child, but the child persists in resistance because they are coerced by court order. Paradoxically, removal of the order for reunification could promote progress towards reunification. It is important to emphasize here that while [Ar.P.'s] statement . . . suggests [he and Father] have formed significant internal structures that will allow them to resolve paternal relationship issues, they are also bolstered by the

5

restraining order and the therapeutic relationship with this writer." Ar.P. wanted the case closed and " 'to have a normal life without court.' " Ar.P. also continued to report he did not feel safe or comfortable with Father and did not want any type of visits with Father until Ar.P. was ready, which " 'could be a month, two months, or a year' " and did not want the court and/or Father to force him to visit Father.

In May 2021, Ar.P.'s counsel filed a request for a restraining order protecting Ar.P., A.P., and the mother from Father, given that the criminal protective order was set to expire in the coming months. The court granted a temporary restraining order and set a hearing for the request for a permanent order.

As of June 2021, Father was still working toward accomplishing his therapeutic goals. At the outset of a July 8, 2021 hearing on the restraining order request, the court indicated its intention to "close the case with a juvenile custody order, providing for the visits in a therapeutic setting." The hearing was continued, and when it resumed, the court indicated its further intention to grant the requested permanent restraining order. The court then teed up the issue of terminating the case, and Father asked to be heard regarding the custody and visitation terms of a prospective custody order. Father argued for expanded visitation and/or custody for Father, but did not object to or express disagreement with the court's stated intention to terminate juvenile court jurisdiction.

The court granted the permanent restraining order. The court further found that "because of [the] mother's great participation in programs and her continued protective capacity that conditions that brought the case before the court no longer

exist and are not likely to exist if supervision is withdrawn." It concluded that it was "in the best interest of the child, given [the] mother's protective capacity, that the case close with a juvenile custody order providing for sole legal and sole physical custody of [Ar.P.]" with "a monitored visit [with Father] in a therapeutic setting one time a month." The court issued orders to this effect on July 8, 2021, but stayed termination of jurisdiction until receipt of the family court custody order. The custody order was filed July 16, 2021, and juvenile jurisdiction was terminated as of that date.

Father timely appealed orders of the court that he identifies as orders on the following dates/with the following descriptions: "7-8-21 and 7-16-21 (Juvenile Custody Order) and 7-8-21 (Restraining order)."

## DISCUSSION

On appeal, Father argues the court erred in terminating dependency jurisdiction. DCFS responds, inter alia, that Father failed to object to the termination of juvenile court jurisdiction below, and thereby forfeited his ability to do so on appeal.[3] (See

---

[3] DCFS also questions the sufficiency of Father's notice of appeal to support an appeal challenging the termination of jurisdiction. The notice identifies the orders appealed from by date and description. The descriptions do not refer to termination of jurisdiction, but the dates do correspond to the dates of orders addressing termination of jurisdiction. We interpret the notice of appeal broadly and conclude we have jurisdiction to decide the matter on appeal. (See Cal. Rules of Court, rule 8.100(a)(2) [a "notice of appeal must be liberally construed" and "is sufficient if it identifies the particular judgment or order being appealed"].)

7

*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338 ["[m]any dependency cases have held that a parent's failure to object or raise certain issues in the juvenile court prevents the parent from presenting the issue to the appellate court"]; *In re Cheryl E.* (1984) 161 Cal.App.3d 587, 603 ["[a] party on appeal cannot successfully complain because the trial court failed to do something which it was not asked to do"].)  Father does not dispute that he failed to challenge termination below.  Instead, he asks this court to exercise its discretion and excuse such failure, because "[t]ermination of jurisdiction which directly results in final custody and visitation orders regarding dependent children involves [a] public interest and public policy." (See *Hale v. Morgan* (1978) 22 Cal.3d 388, 394.)  We decline the invitation.

Father also urges that we consider his argument despite his failing to raise it below because "it would have been futile to object to termination of jurisdiction."  Specifically, he argues that "termination of jurisdiction was based on [DCFS's] recommendation for final custody and visitation orders," and the court had already rejected Father's arguments on these points. (See *People v. Hill* (1998) 17 Cal.4th 800, 820 [defendant need not object to preserve an issue for appeal where to do so would have been futile].)  But Father's objection to the termination of jurisdiction need not have been based on any deficiency in the custody or visitation orders.  Father could have argued, as he does on appeal, that continuing jurisdiction was warranted on some other basis.  He did not.  Having failed to challenge the termination of juvenile court jurisdiction below, he may not do so now.

Father has identified no other potential error in the court's termination of juvenile court jurisdiction.  Accordingly, we must affirm.

## DISPOSITION

The order is affirmed.

<u>NOT TO BE PUBLISHED</u>.



ROTHSCHILD, P. J.

We concur:



CHANEY, J.



BENDIX, J.

9