[No. F004174. Fifth Dist. Feb. 27, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
ROY S. FLORES, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III and V, VI, VII and VIII.

**COUNSEL**

Eric L. Henrikson, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Jane N. Kirkland and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## HANSON (P. D.), Acting P. J.—

### I

Appellant Roy Segundo Flores was convicted of two counts of second degree murder (Pen. Code, § 187)[1] and one count of attempted murder (§§ 187/664). As to each count, it was found that appellant used a firearm (§ 12022.5). Appellant was sentenced to a term of 15 years to life for each murder conviction, and 9 years for the attempted murder conviction.

### FACTS

On the night of August 28, 1984, two men were killed at the San Antonio Alegre Bar (Alegre) and a third was wounded.

Jose Meza, a customer, testified he was a friend of the two men who were killed. Meza stated that as he approached the Alegre he noticed a man leaving the building. Inside, when Meza left the booth where two friends, Juan Espinoza and Eulogio Garcia, were sitting, he saw the same man return, carrying a handgun; he walked to the booth and began shooting at Meza's friends, killing both of them and wounding an innocent bystander. When the man with the handgun fled, Meza followed and fired at him with a pistol Meza had in his possession. The man returned the fire as did Meza, who chased the suspect down the street.

Appellant was arrested later at Community Hospital while being treated for a gunshot wound. Appellant told a police officer at the hospital he had been wounded at the Alegre during a shooting incident. Appellant was identified at trial as the man with a gun at the bar. Two witnesses identified appellant from a photographic lineup.

### DISCUSSION

### II

#### *The Implied Malice Instruction*

■ Appellant contends the jury was not instructed properly that implied malice requires the finding that appellant acted with a subjective appreciation of the risk created by his conduct. The jury was instructed as follows:

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

"Malice is implied when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose, and with a wanton disregard for human life." This language in CALJIC No. 8.11 is the first alternative implied malice instruction. Appellant argues the language was incomplete and should have been read in conjunction with the second alternative implied malice instruction in CALJIC No. 8.11, which states malice exists: "[when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life]." Appellant maintains the latter language informs the jury that the subjective awareness criterion of malice is necessary.

The instruction in *People* v. *Phillips* (1966) 64 Cal.2d 574 [51 Cal.Rptr. 225, 414 P.2d 353], upon which appellant relies, reads: "'[The] unlawful killing of a human being with malice aforethought, but without a deliberately formed and premeditated intent to kill, is murder of the second degree (1) If the killing proximately results from an unlawful act, the natural consequences of which are dangerous to life, which act is deliberately performed by a person who knows that his conduct endangers the life of another, or (2) If the circumstances proximately causing the killing show an abandoned and malignant heart. . . .'" (*Id.*, at p. 586.) The court in *Phillips* was concerned that the terms "unlawful" and "abandoned and malignant heart," as used in the instruction, could mislead the jury. (*Id.*, at p. 587.) The court concluded the following is a more accurate statement on the definition of malice: '[T]he killing proximately resulted from an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'" (*Id.*, at p. 587.) The court suggested a jury so instructed would properly use a subjective rather than an objective standard. (*Id.*, at p. 588.)

Cases citing *Phillips* state that a finding of implied malice depends upon a determination the defendant actually appreciated the risk involved, i.e., a subjective standard. (*People* v. *Watson* (1981) 30 Cal.3d 290, 296-297 [179 Cal.Rptr. 43, 637 P.2d 279].) In *Watson,* the California Supreme Court discussed the term "implied malice" as it related to probable cause and a second degree murder charge. (*Id.*, at pp. 299-300.) The *Watson* court reiterated the language of *Phillips*,[2] but provided another definition of the term: "Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will result in death and does it

[2]This point was later restated in *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913].

with a base antisocial motive and with a wanton disregard for human life."
(*Id.*, at p. 300.) The trial court used essentially the same language when it
instructed the jury on implied malice. Other courts also have used the def-
inition alternatively. (See *People* v. *Atkins* (1975) 53 Cal.App.3d 348, 359
[125 Cal.Rptr. 855] [the exact instruction used in the instant case was held
to be sufficient]; *People* v. *Poddar* (1974) 10 Cal.3d 750, 754-755 [111
Cal.Rptr. 910, 518 P.2d 342] [same instruction read to the jury].)

The specific phrase, "which act is done for a base, antisocial purpose and
with wanton disregard for human life," requires the jury to question appel-
lant's subjective thoughts while committing the crime. The jury was alerted
to the necessity of finding a subjective awareness. We find no error.

III*

. . . . . . . . . . . . . . . . . . . . . . . . .

IV

*Attempted Murder and a Finding of Express Malice*

■ Appellant contends that in instructing on the crime of attempted
murder, no reference to implied malice should be made. (*People* v. *Johnson*
(1981) 30 Cal.3d 444, 448 [179 Cal.Rptr. 209, 637 P.2d 676]; *People* v.
*Collie* (1981) 30 Cal.3d 43, 61 [177 Cal.Rptr. 458, 634 P.2d 534, 23
A.L.R.4th 776]; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 765 [175
Cal.Rptr. 738, 631 P.2d 446].) Appellant is correct. (*People* v. *Santascoy*
(1984) 153 Cal.App.3d 909, 918 [200 Cal.Rptr. 709].) ■ Our question
is whether appellant suffered any prejudice as a result of any confusion in
the instructions.

In reviewing the instructions as a whole, as we must, we ascertain that
the instructions were sufficient to alert the jury that a finding of a specific
intent to kill is necessary for a conviction of attempted murder. We affirm
the judgment in count three.

The jury was instructed as follows: "When one attempts to kill a certain
person, but by mistake or inadvertence injures a different person, the crime,
if any, so committed is the same as though the person originally intended

---

*See footnote, page 74, *ante*.

to be killed, had been injured." (CALJIC No. 8.65 as modified.) By the above crucial instruction, the court informed the jury that it would be impossible to find attempted murder based on transferred intent, a necessary element here, unless appellant intended to kill. The victim in count three was not an intended recipient of the armed assault; attempted murder occurred only if the intent existed to kill someone. The jury previously had been instructed: "In the crime of attempted murder, the necessary mental state is malice aforethought," and that "[m]alice is express when there is manifested an intention unlawfully to kill a human being."

The jurors were not misled by the instructions which followed these instructions on intent to kill: "Regarding Count III, an attempt to commit a crime, consists of two elements, namely, a specific intent to commit the crime, and a direct, but ineffectual act, done toward its commission.

"In determining whether or not such an act was done, it is necessary to distinguish between mere preparation, on the one hand, and that [sic] actual commencement of the doing of the criminal deed, on the other. Mere preparation, which may consist of planning the offense, or of devising, obtaining or arranging the means for its commission, is not sufficient to constitute an attempt, but acts of a person who intends to commit a crime will constitute an attempt where they, themselves, clearly indicate a certain, unambiguous intent to commit that specific crime, and, in themselves, are an immediate step in the present execution of the criminal design, the progress of which would be completed unless interrupted by some circumstance not intended in the original design." (CALJIC No. 6.00.)

A number of cases have affirmed convictions, even though instructions were given incorrectly, by considering the findings necessarily made on other counts where convictions resulted. In *People* v. *Murtishaw, supra,* 29 Cal.3d 733, although there was instructional error, the California Supreme Court held because the jury found the defendant guilty on three counts of first degree murder on the same facts and rejected his diminished capacity defense, it was virtually certain the jury found the defendant intended to kill the victims. (*Id.,* at p. 765.) The facts also clearly established a specific intent to kill[3] which could be rejected only on a finding of diminished capacity. The same intent to kill was presumed present as to the fourth victim who survived. (*Ibid.*) Unlike *Murtishaw,* here, in addition to the conviction for attempted murder, appellant was convicted of two counts of second degree murder which properly can be based upon a finding of implied malice and for which crimes those instructions were given.

---

[3]In *Murtishaw,* the California Supreme Court stated that by instructing on implied malice a court runs the risk of suggesting to a jury that they can convict without finding a specific intent to kill.

In *People* v. *Santascoy, supra,* 153 Cal.App.3d 909, the court in examining the instructions, focused on whether the attempt instructions adequately explained the necessity of finding a specific intent to kill. The court held that as to the particular charge of attempted murder, the jury was not told that anything less than the specific intent to kill would suffice. (*Id.,* at p. 918.) The court did note that attempted murder was the only charge involved, and CALJIC No. 8.11 should not have been read to the jury because "instructions in this respect should be lean and unequivocal in explaining to the jury that only a specific intent to kill will do." (*Ibid.*)

Here, attempted murder was not the only charge, and the trial court was required to instruct on implied malice.[4] The fact that transferred intent to kill was the crux of this attempted murder, and the jury was so instructed, removes it from the problem discussed in *Murtishaw.* Intent to kill is express malice; any extraneous instructions did no harm. The instructions further discussed the necessity of finding the specific intent to commit a crime, and "a certain unambiguous intent to commit that specific crime." The jury in fact was told for a conviction of the crime of attempted murder, a finding of express malice was required, based on transferred intent. There was no error.

## V-VIII*

· · · · · · · · · · · · · · · · · · · · · · · · ·

## IX

### *Sentence for Attempted Murder*

Appellant challenges the validity of his sentence for attempted murder under various theories. Much of his argument stems from Proposition 7,

---

[4]CALJIC No. 8.11 states in relevant part: "[Malice is express when there is manifested an intention unlawfully to kill a human being.] [¶] [Malice is implied [when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life.] [¶] [When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought.] [¶] The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed. [¶] 'Aforethought' *does not imply* deliberation or the lapse of considerable time. It only means that the required mental state must precede, rather than follow the act."

*See footnote, page 74, *ante.**

the Briggs Initiative passed in November 1978. The initiative changed the sentences for first and second degree murder and indirectly affected the sentence for attempted murder. We hold appellant's constitutional rights were not violated by the passage of the initiative as it pertains to sentencing for attempted murder.

## A. *Procedural Due Process*

 Appellant contends his procedural due process rights were violated because Proposition 7 did not meet the mandates of the Elections Code, arguing the Attorney General's title and summary to the proposition failed to inform the public that punishment for attempted murder would be affected.

Before Proposition 7, the punishment for first degree murder was life imprisonment. Second degree murder convictions were subject to determinate terms of five, six or seven years. Attempts were subject to section 664 which assigned a sentence equal to one-half the determinate term for the completed crime, or if the maximum term was life, a determinate term of five, six or seven years. (Stats. 1976, ch. 1139, § 265.) Under this rule, and prior to Proposition 7, the punishment for attempted first degree murder was five, six or seven years;[5] the punishment for attempted second degree murder was two and one-half, three, or three and one-half years.

Proposition 7 changed these terms. First degree murder became punishable by 25 years to life, while second degree murder became punishable by 15 years to life. Because no changes were made to the statutes governing attempts, all first and second degree murder attempts were punishable pursuant to section 664, by terms of five, seven or nine years.

 Although appellant contends the failure to inform the general voting public of this result was error and violates procedural due process rights, generally, the title and summary preceding an initiative need not contain a complete catalog or index of all provisions within the initiative. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 243 [149 Cal.Rptr. 239, 583 P.2d 1281].) The title and summary inform the public of the general purpose of the initiative. (*Clark* v. *Jordan* (1936) 7 Cal.2d 248, 252 [60 P.2d 457, 106 A.L.R. 549].) If reasonable minds may differ as to the sufficiency of the title, the title is held to be sufficient. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* at p. 243.) A title and summary should fairly represent the initiative and not mislead the public, but as long as only auxiliary

---

[5]This determinate term was later increased to five, seven or nine years.

or subsidiary matters are omitted, they are considered to be in substantial compliance. (*Brennan* v. *Board of Supervisors* (1981) 125 Cal.App.3d 87, 96 [177 Cal.Rptr. 677]; compare *Boyd* v. *Jordon* (1934) 1 Cal.2d 468 [35 P.2d 533] [title did not show nature of petition nor subject with which it related]; *Clark* v. *Jordan, supra,* 7 Cal.2d 248 [title was misleading because it failed to indicate proposal was also a taxing measure].)

■ Applying these principles, the title and summary preceding Proposition 7 were adequate.[6] The initiative addresses only the crime of murder and the punishments assigned to a murder conviction. No mention is made of the crime of attempted murder. The "chief purpose and points" of the initiative, however, are sufficiently dealt with. There was substantial compliance, which is all that is required. (*Epperson* v. *Jordan* (1938) 12 Cal.2d 61, 70 [82 P.2d 445].)

The effect of Proposition 7 in making all degrees of attempted murder punishable in the same way was not readily apparent from a reading of the initiative. To require the Attorney General to specify every potential effect of an initiative extends beyond the purpose of the title and summary. The title fairly and sufficiently described the initiative and did not mislead the public.

Appellant's procedural due process rights were not violated by the failure to address the effect the measure would have on the crime of attempted murder.

## B. *Substantive Due Process*

■ Appellant also urges his substantive due process rights were violated by the failure to provide different penalties for first and second degree attempted murder. ■ However, due process is not violated as long as the statute procedurally is fair and is reasonably related to a proper legislative goal. (*Hale* v. *Morgan* (1978) 22 Cal.3d 388, 398 [149 Cal.Rptr. 375, 584 P.2d 512].) "The touchstone of due process is protection of the individual against arbitrary action of government." (*Wolff* v. *McDonnell* (1974) 418 U.S. 539, 558 [41 L.Ed.2d 935, 952, 94 S.Ct. 2963, 2976].)

---

[6]The title and summary of Proposition 7 reads as follows: "MURDER. PENALTY. INITIATIVE STATUTE. Changes and expands categories of first degree murder for which penalties of death or confinement without possibility of parole may be imposed. Changes minimum sentence for first degree murder from life to 25 years to life. Increases penalty for second degree murder. Prohibits parole of convicted murderers before service of 25 or 15 year terms, subject to good-time credit. During punishment stage of cases in which death penalty is authorized: permits consideration of all felony convictions of defendant; requires court to impanel new jury if first jury is unable to reach a unanimous verdict on punishment. Financial impact: Indeterminable future increase in state costs."

The law should not be unreasonable, arbitrary or capricious; it must have a real and substantial relation to the object sought to be obtained. (*Nebbia v. People of State of New York* (1934) 291 U.S. 502, 525 [78 L.Ed. 940, 950, 54 S.Ct. 505, 510-511, 89 A.L.R. 1469].)

 Section 664, which as a result of Proposition 7 provides identical terms for attempted first and attempted second degree murder, of course, must be reasonably related to its proper legislative goal, punishment. However, the power to assign penalties for the commission of crimes rests with the Legislature and not the courts. (21 Am.Jur.2d, § 589.) The Legislature also has the authority to change the penalties, or separate them by degree. (21 Am.Jur.2d, § 590.) The problem was created by the electorate; it can be inferred from the Legislature's inaction that it approves of the result and all forms of attempted murder are to be punished in the same manner. Even before the passage of Proposition 7, the Legislature decided that all attempted crimes, which carry a potential life sentence if completed, are to be punished in the same manner regardless of whether one crime is more serious than another.[7] This policy decision was unaffected by Proposition 7. Therefore, when the people through the initiative process increased the penalty for second degree murder to 15 years to life, the punishment for attempted second degree murder merely fell within the guidelines of the earlier legislative policy.[8]

The provision of section 664 resulting in all attempted murders being punished equally is rationally related to a proper legislative goal.

## C. *Equal Protection*

 Appellant next asserts he has been denied equal protection because he received the same sentence as one convicted of attempted first degree murder. Appellant objects to the failure to define separate punishments for first and second degree attempts in the same manner that the Determinate Sentencing Law defines crimes which are divided into degrees.

---

[7]Appellant cites *Hale v. Morgan, supra,* 22 Cal.3d 388 that varying degrees of penalties must be assigned to varying degrees of conduct. However, *Hale* is distinguishable. *Hale* involved a statute imposing mandatory penalties on landlords for "willfully" interrupting a tenant's utilities. The court held that the statute violated substantive due process because it took away discretion and ignored the circumstances of the violation, the parties involved, and the damage caused. The court held these penalties "overbalanced and outweighed" the reasonable goals underlying the statute. As to sentences for attempted murder, however, the court still retains discretion and can look to the underlying facts to determine the actual sentence imposed. The goal sought is punishment and deterrence. Sentences of five, seven or nine years for all attempted murders do not "overbalance and outweigh" this goal.

[8]Convictions for attempted murder must be based on a finding of express malice. As a result, the level of culpability from one attempted murder to another is, theoretically, not that disparate.

Appellant fails to define a class to which he belongs, and does not complain of unequal treatment of persons similarly situated, but of equal treatment of people dissimilarly situated.

Almost the same argument was made and rejected in *People* v. *Macias* (1982) 137 Cal.App.3d 465 [187 Cal.Rptr. 100]. Justice Work in *Macias* discussed the various types of classes of which the defendant could be a member[9] and concluded he belonged to the class of all persons convicted of attempting to commit a felony which, if successful, could result in an indeterminate maximum sentence of life imprisonment. (*Id.*, at p. 473.) The *Macias* opinion addressed the history of section 664 and the designated punishments for certain types of attempted crimes. (*Id.*, at pp. 474-475.) The court noted the determination of whether to divide certain crimes into degrees was a legislative function and not a judicial one. (*Id.*, at p. 474.) The *Macias* opinion concluded the Legislature's failure to make changes since the problem was addressed in case law over 50 years earlier, reflected an "intent to relate the punishment for attempt to the maximum penalty established for the underlying crime." (*Id.*, at p. 475.) The court stated: " 'This test presumes the constitutionality of the statute and requires merely that the distinction drawn by the statute bear some reasonable relationship to a conceivable legitimate state purpose. . . .' " (*Ibid.*)

■ Appellant does not challenge the above thrust of the *Macias* opinion, but argues that once the distinctions were recognized, *Macias* applied the wrong standard of review—the rational basis test. Appellant contends his fundamental interest in liberty is involved, and the strict scrutiny test should have been applied. To justify its use of the rational basis test, the *Macias* court relied upon *People* v. *Hernandez* (1979) 100 Cal.App.3d 637 [160 Cal.Rptr. 607], which involved the propriety of imposing a one-year enhancement for a prior conviction. (*Id.*, at p. 643.) The *Hernandez* court offered the following reason for its choice of the rational basis test: "This does not imply that liberty is not a fundamental interest. (*People* v. *Olivas* (1976) 17 Cal.3d 236, 250-251 . . . .) We believe that there is a qualitative difference, however, between the initial interest one has in retaining his liberty prior to sentencing and the interest one has in whether or not an enhancement applies. The latter situation is more analogous to the case

---

[9]The potential classes appellant could belong to according to the *Macias* opinion include: "(A) all felons convicted of attempting a felony divided into degrees (limited only to murderers and burglars); (B) all attempted second degree murderers and burglars; (C) all persons convicted of attempting to commit a felony, the completion of which would result in an indeterminate sentence of life imprisonment (first degree murderers, second degree murderers and various types of kidnappers, including nonforceable kidnaps for the purpose of robbery, or ransom); (D) all persons convicted of attempting murder; (E) all persons convicted of attempting second degree murder; (F) all persons convicted of second degree felonies carrying an indeterminate life sentence."

dealing with the different statutory treatment of good behavior participation credits (*In re Stinnette* (1979) 94 Cal.App.3d 800 . . . .) and credit for time served in custody prior to the commencement of a prison term. (*In re Kapperman* (1974) 11 Cal.3d 542 . . . .) In these cases the rational basis test was applied as the proper test. (*Kapperman, supra,* at p. 548; *In re Stinnette, supra,* at p. 805.) The *Kapperman* and *Stinnette* cases, as well as the instant situation, concern the effects of certain legislative enactments upon an individual's underlying sentence and actual time served and not whether that person is to be deprived of his liberty in the first place. As a result, the rational basis test properly controls in this instance in determining the validity of the legislative classification. . . ." (*Id.,* at p. 644, fn. 2.)[10]

The *Macias* court also relied upon *In re Kapperman* (1974) 11 Cal.3d 542 [114 Cal.Rptr. 97, 522 P.2d 657], a case which dealt with the constitutionality of a statute that gave credit for presentence custody, but applied the credit prospectively. In holding the prospective application test to be unconstitutional, the *Kapperman* court applied the rational basis test, and offered no explanation for choosing the test. (*Id.,* at p. 546.) The *Kapperman* court relied upon *McGinnis* v. *Royster* (1973) 410 U.S. 263 [35 L.Ed.2d 282, 93 S.Ct. 1055] which dealt with the availability of "good time" credits. The *McGinnis* court noted the distinction the defendant complained of arose in the state's effort to rehabilitate prisoners effectively without releasing them prematurely. (*Id.,* at pp. 269-270 [35 L.Ed.2d at pp. 288-289].) The court concluded that because the determination of optimal time for parole eligibility elicited various legislative classifications and groupings, the rational basis test should be applied. (*Id.,* at p. 270 [35 L.Ed.2d at pp. 288-289].)

---

[10]Four years after *Hernandez,* this court disapproved of its language on similar facts in *People* v. *Williams* (1983) 140 Cal.App.3d 445 [189 Cal.Rptr. 497], and indicated the strict scrutiny test should be applied. (*Id.,* at p. 450.) We distinguish the cases relied upon in *Williams.* Both cases dealt with the ex post facto application of statutes. In *In re Stanworth* (1982) 33 Cal.3d 176 [187 Cal.Rptr. 783, 654 P.2d 1311], the California Supreme Court held that because the defendant was sentenced under the indeterminate sentencing law, he was entitled to parole release considerations under both that law and the newly enacted determinate sentencing law. (*Id.,* at p. 188.) To limit him to the procedures in the determinate sentencing law would run the risk his sentence could be affected by a different determination of postconviction credit. The court resolved the question on a purely ex post facto basis. (*Id.,* at p. 179.) *Weaver* v. *Graham* (1981) 450 U.S. 24, 30-31 [67 L.Ed.2d 17, 24, 101 S.Ct. 960, 965] dealt with the ex post facto application of a Florida statute that changed the availability of time earned for good conduct. The court discussed the distinction between legislative decisions on terms of punishment and ex post facto: "Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated. Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the clause if it is both retrospective and more onerous than the law in effect on the date of the offense." (Fn. omitted.) The court in no way inferred there was a fundamental right in a shorter term of imprisonment.

The California Supreme Court's discussion in the recent torture murder case, *People* v. *Davenport* (1985) 41 Cal.3d 247, 270 [221 Cal.Rptr. 794, 710 P.2d 861], supports our conclusion that the rational basis test applies. The court's discussion relates to special circumstances.

After reviewing case law supporting the various arguments in terms of the facts and questions presented in this case, we find persuasive the positions taken in *Davenport, Macias* and *Hernandez* in applying the rational basis test. The decision of how long a particular term of punishment should be is left properly to the Legislature. The Legislature is responsible for determining which class of crimes deserves certain punishments and which crimes should be distinguished from others. As long as the Legislature acts rationally, such determinations should not be disturbed.

We are concerned here with the Legislature's role, or the people's, through the initiative process, in designating terms of punishment for certain crimes. Appellant does not have a fundamental interest in a specific term of imprisonment or in the designation a particular crime receives. We apply the rational basis test. ▆▆▆ By failing to divide attempted murder into degrees after Proposition 7, the Legislature reacted to the will of the people who indicated that both first and second degree murder potentially were serious enough to warrant life imprisonment. Consistent with its earlier policy determination, the Legislature decided that *any* attempt to murder, regardless of the underlying facts, deserved an equal penalty. Based upon this policy decision, a rational basis exists to punish all attempted murders equally; as a result, appellant's equal protection rights are not violated.

## D. *Cruel and Unusual Punishment*

▆▆▆ Appellant's final argument is that an identical punishment for both first and second degree attempted murder constitutes cruel and unusual punishment.

▆▆▆ A defendant who makes such a challenge bears the burden of establishing that the punishment is so disproportionate to the crime it shocks the conscience and offends fundamental notions of human dignity. (*People* v. *Wingo* (1975) 14 Cal.3d 169, 174 [121 Cal.Rptr. 97, 534 P.2d 1001]; *In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921].) The Legislature is accorded the broadest discretion possible in enacting penal statutes and in specifying punishments. (*In re Lynch, supra,* 8 Cal.3d at p. 414.) Such questions initially are left to the judgment of the legislative branch. (*Ibid.*) Only when the punishment is out of all proportion to the offense and is clearly an extraordinary penalty for a crime of ordinary gravity committed under ordinary circumstances, do the courts denounce it as

unusual. (*People* v. *Schueren* (1973) 10 Cal.3d 553, 559 [111 Cal.Rptr. 129, 516 P.2d 833].)

The punishment for attempted second degree murder is neither out of all proportion nor clearly an extraordinary penalty. The five, seven or nine year determinate term imposed pursuant to section 664 is reasonable compared to the penalty of fifteen years to life for the completed crime when considering the serious nature of the crime attempted.

Appellant concedes this reasonableness, but argues the punishment for attempted second degree murder is cruel and unusual when compared with the punishment for attempted first degree murder which is the same. However, the Legislature is under no duty to divide a crime into degrees. The mere fact the completed crime is divided into degrees does not compel the same division for the attempted crime. (*People* v. *Arguero* (1931) 113 Cal.App. 424, 427 [298 P. 520].) The result may be inconsistent, but that does not make it unconstitutional.

Finally, appellant tries to correlate this issue with comparisons made between greater and lesser crimes. Appellant cites *People* v. *Schueren, supra,* 10 Cal.3d 553 for the proposition that when a particular crime carries a punishment greater than the punishment for the crime of which it is a lesser included offense, the punishment may be cruel and unusual. (See *id.,* at pp. 560-561.) In effect, the defendant may be punished for exercising the right to go to trial and successfully defend against the greater crime. (*Ibid.*) However, the point is distinguishable. The punishment for the greater crime in *Schueren* had a maximum term of 14 years. The *Schueren* court held that in such a situation the term for the lesser crime *exceeding* 14 years, with a maximum term of life was cruel and unusual. (*Id.,* at p. 560.) The case said nothing about the necessity of graduating degrees of punishment because one is a greater offense while the other a lesser. The language in the case indicates the court would not find equal penalties for both the greater and lesser crime cruel and unusual. We conclude equal penalties for both degrees of attempted murder are not cruel and unusual.

We affirm the judgment as to all counts.

Woolpert, J., and Hamlin, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 20, 1986.