[No. A041831. First Dist., Div. One. May 25, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
JANE ELLYN BENSON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for publication with the exception of sections II, III and V.

**COUNSEL**

Kathleen Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, David

D. Salmon and Charles R. B. Kirk, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**STEIN, J.**—Jane Ellyn Benson appeals from a judgment convicting her of second degree murder. The jury also found true allegations that Benson personally used a firearm (Pen. Code, §§ 1203.06, subd. (a)(1), 12022.5) and was armed with a firearm (Pen. Code, § 12022, subd. (a)).[1] Appellant was sentenced to state prison for a term of from 15 years to life, with a determinate term of 2 years for the enhancements to be served prior to the commencement of the indeterminate term.

On appeal she contends: (1) The standard instructions on implied malice, CALJIC Nos. 8.11 and 8.31, are erroneous because they permit the jury to convict appellant of second degree murder without finding that appellant subjectively appreciated the risk to human life created by her conduct; (2) the court erred in giving CALJIC No. 8.75 because the instruction interferes with the jury's control of the order of deliberations; (3) the court erroneously excluded a lay witness's testimony that he did not take seriously appellant's statement that if she found out who stole her property she would "shoot [the thief] in the foot"; (4) the court erred in admitting prior inconsistent statements that were consistent with appellant's testimony at trial, and in instructing the jury pursuant to CALJIC No. 2.03; (5) the court erred in refusing to poll the jury on whether any of them had read a newspaper article reporting that the police suspected that appellant was using heroin at the time the shooting occurred.

**FACTS**

Appellant and the victim, Elaine Wright, were friends. On June 15, 1987, Elaine and her fiancé, Joe McMahon, held a small party to announce their engagement. Around 1 a.m., McMahon and Elaine retired to the master bedroom while the party continued. Sometime after 3 a.m., appellant left with Tony Cavagna, a former lover of Elaine's.

During the course of the next few hours appellant became convinced that McMahon had participated in stealing some property belonging to her and

---

[1] An additional allegation that appellant inflicted great bodily injury, within the meaning of Penal Code section 12022.7, was stricken on December 21, 1987, on the motion of the district attorney.

to her former boyfriend Sam Dennison. Both Dennison and appellant's own mother had accused appellant of stealing this property. In addition, Cavagna told appellant that he had seen a makeup bag—like one appellant had misplaced—in Elaine's house and Elaine's parents' house. Cavagna testified that when he revealed this, appellant got angry "but with control." "She said if she found out who had done it, she would shoot them in the foot."[2]

Appellant suggested that they awaken McMahon and recover everything. About 7 a.m., McMahon was awakened by the sound of someone banging loudly on the front door. Charlie Harris, a houseguest, woke up and let appellant and Cavagna in. Appellant burst into the bedroom where McMahon and Elaine were sleeping and screamed at them demanding the return of her property.[3] Appellant was carrying a Raven .25-caliber pistol in her right hand. She fired one shot into the floor, moved closer to the bed, and then fired a second shot in the same direction.

As McMahon started to get out of bed, appellant left the bedroom. McMahon followed her into the living room. Appellant then walked back into the bedroom. McMahon saw Elaine sit up in bed and pull the blanket under her chin with both hands. He heard shouting, and then there was a third shot. According to McMahon, after the third shot he and Elaine's sister, Melinda, ran into the room. Cavagna followed closely. Appellant was standing several feet away from the bed facing Elaine, still holding the gun in her right hand. Elaine had been shot in the chest and died of her wounds.

Appellant made several different statements regarding what had transpired in the bedroom when the third shot was fired: Immediately after the shooting, Melinda ordered appellant to leave. On appellant's way out, Cavagna asked her why she shot Elaine. Appellant stated that "Elaine had grabbed the gun." Appellant made this same statement to the police immediately after she was arrested. Shortly after the shooting, but before she was arrested, she told her current boyfriend that the gun had accidentally discharged when Elaine bumped into it and then later told him that someone had shoved her from behind. She also had a conversation with her friend Shelley Jenkins on June 16, in which she stated that something bumped her from behind and she fell forward and squeezed the trigger. After being released on bail, appellant told McMahon that when Melinda came into the room she grabbed at appellant causing the gun to discharge accidentally.

---

[2] Appellant testified that she "heard John Wayne say it, so that is why I said it. [¶] Because a man stole his horse and he shot the man in the foot. So he wouldn't steal his horse anymore." But she testified she did not use the phrase with Cavagna that morning because she did not know that Elaine and McMahon were involved in the theft.

[3] McMahon testified that appellant's anger was directed primarily at Elaine based on appellant's belief that Elaine had stolen her makeup bag. Cavagna, on the other hand, testified that appellant directed only a few comments towards Elaine.

The police found no gunshot residue on Elaine's hands, which was inconsistent with them being near the muzzle when the gun was fired. John Yount, a criminalist, examined the blanket which had been covering Elaine. Because there were two bullet holes in the blanket, one of which was surrounded with a heavy residue of unburned powder particles, Yount concluded that the blanket had been folded over. Based upon the size of the powder burn in the blanket, the muzzle of the pistol must have been in contact with the blanket or within a half inch of it. As explained by criminalist Paul Dougherty, Elaine could not have grabbed the pistol because, unless the blanket was held in both hands, it would have immediately sagged or dropped and the bullet holes which were found in the blanket could not have occurred.

Criminalist Dougherty also tested the ejection characteristics of the Raven pistol. Two empty shell casings were found on the bedroom floor. But a third was found in an ashtray on a night stand next to the bed. Due to the ejection pattern, Dougherty concluded that the casing found in the ashtray had bounced off the bedroom ceiling. Although the two casings found on the bedroom floor were consistent with shots fired with the gun pointed towards the ground, the casing in the ashtray was consistent with the gun being pointed at the bed.

Examination of the pistol itself revealed that "accidental" discharge was unlikely. The pistol had a trigger pull of eight and one-half pounds or more, which is a heavy trigger pull in comparison to other guns.

Appellant testified that she had gone to McMahon's to recover her property. She stated that she fired the first shot in the floor when McMahon did not respond to her demand that he get up. She fired the second shot because he wasn't getting up fast enough. She then left the room to check the bathroom to see if her makeup case was there and then returned to the bedroom to confront Elaine. "And I looked at her and I kicked her in the foot and I said, 'You are not my friend, either, you are a damn thief, too. You get up and get your clothes on, too, you are going with me.' [¶] And she started yelling and screaming at me and I was yelling and screaming at her." Appellant repeatedly accused Elaine of being a thief, and Elaine resolutely denied it.

But just then appellant heard Melinda come running down the hallway and into the bedroom. "She came charging through that damn door, and I couldn't see who it was." All three women were screaming. Appellant had been pointing the pistol at the floor, but in the commotion, lost her balance and reached out for the wall. The gun went off as appellant faced Elaine, when appellant was shoved.

At first appellant was going to do cardiopulmonary resuscitation but then realized that it cannot be done on people bleeding from the mouth. She shouted for someone to call 911 instead. After stating several times that it was an accident, appellant drove to her friend Shelly Jenkins's house so she could call the police and report the shooting.

## I. IMPLIED MALICE INSTRUCTIONS

■ Appellant's first contention is that the instructions given on implied malice, CALJIC Nos. 8.11 and 8.31, are erroneous. The version of CALJIC No. 8.11 that appellant challenges reads: ". . . Malice is implied when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base antisocial purpose and with a wanton disregard for human life, *or* when the killing results from an intentional act the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." (Italics added.) The court was quoting from CALJIC No. 8.11. The most recent revision of No. 8.11 in CALJIC (5th ed.) eliminates any reference to the first definition of implied malice involving "wanton disregard for human life." The comment states that "[i]n order to avoid any possible ambiguity, the Committee has concluded that only one definition should be utilized and has selected the one that is more comprehensible to the average juror." CALJIC No. 8.31 contained the identical language.

These two instructions are based on language in *People* v. *Watson* (1981) 30 Cal.3d 290 [179 Cal.Rptr. 43, 637 P.2d 279]. In *Watson* the court held that "a finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard. [Citation]" (*Id.* at pp. 296-297, italics in original.) The court then defined malice as " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who . . . acts with conscious disregard for life . . .' [Citation.] *Phrased in a different way,* malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life. [Citation.]" (*Id.* at p. 300, italics added.)

Appellant contends by substituting the word "or" for "phrased in a different way," the instruction could be interpreted as enunciating two alternative and different tests for determining whether implied malice exists. Appellant asserts that the specific phrase, "which act is done for a base, antisocial purpose and with a wanton disregard for human life," does not

convey to the jury that the defendant must subjectively appreciate that his or her conduct is dangerous to human life.

The same issue has been addressed in numerous decisions and is now pending before the California Supreme Court in *People* v. *Dellinger\** (Cal.App.) G004160. In *Dellinger,* the Court of Appeal opined that the phrase, "wanton disregard for human life," is confusing because the term "wanton" is not defined and does not convey knowing or conscious appreciation of the risk to human life. (*People* v. *Dellinger\** (Cal.App.).) The court further concluded that the error was prejudicial because it was a close case, and because the prosecutor argued to the jury that two different tests could be used. (*People* v. *Dellinger\** (Cal.App.).) Several other cases, most of which also arose in the Fourth Appellate District, have, following similar reasoning, concluded that the standard instructions were erroneous and reversed the conviction on that basis. The California Supreme Court has directed the Reporter of Decisions not to publish these opinions in the Official Reports. (See, e.g., *People* v. *Whitton* (Cal.App.) G004760; *People* v. *Walsh* (Cal.App.) D005082; *People* v. *Guzman* (Cal.App.) G003387.

Other courts have criticized the instruction as confusing but have concluded that, assuming arguendo that the instruction was erroneous, the error was harmless because the case was tried only on the theory of conscious appreciation of the risk (*People* v. *Protopappas* (1988) 201 Cal.App.3d 152, 163-164 [246 Cal.Rptr. 915]), or because the prosecutor's arguments to the jury made it clear that the defendant could be convicted only if he consciously appreciated the risk and stated that the two tests were "similar" (*People* v. *James* (1987) 196 Cal.App.3d 272, 290-291 [241 Cal.Rptr. 691]).

The Fifth District, in *People* v. *Flores* (1986) 178 Cal.App.3d 74 [223 Cal.Rptr. 465], specifically held that the phrase, " 'which act is done for a base, antisocial purpose and with wanton disregard for human life,' requires the jury to question appellant's subjective thoughts while committing the crime." (*Id*. at p. 80.) The defendant contended that by reading to the jury the "wanton disregard" definition of implied malice without also reading the language in CALJIC No. 8.11 regarding "conscious disregard," the jury was not adequately informed that defendant must have acted with subjective appreciation of the risk created by his conduct. (*Id*. at p. 78.) In *People* v. *Rosenkrantz* (1988) 198 Cal.App.3d 1187 [244 Cal.Rptr. 403], the Second District also upheld the instruction, where the only definition of implied malice read to the jury was the phrase involving the terms "wanton disregard" and for a "base antisocial purpose." (*Id*. at p. 1203.) While these two cases are superficially distinguishable because the juries were given *only* the

---

\*Reporter's Note: *People* v. *Dellinger* (1989) 49 Cal.3d 1212, decided December 18, 1989, reverses the judgment of the Court of Appeal on the implied-malice-instruction issue.

"wanton disregard" definition of implied malice, that is precisely the phrase appellant challenges.

We agree that the substitution of the word "or" for "phrased in a different way" creates a potential for confusion. However, appellant's attack on the validity of the instruction ultimately is a challenge to the clarity of the Supreme Court's definition of implied malice in *People* v. *Watson, supra,* 30 Cal.3d 290. The *Watson* court clearly viewed the "wanton disregard" and the "conscious disregard" definitions as interchangeable, and therefore used the phrase "phrased in a different way." (*Id.* at p. 300.) Thus, the substitution of the word "or" should not change the fact that the two definitions mean the same thing. Nonetheless, appellant urges us to conclude that the *Watson* court's definition of implied malice fails to convey to the jury that the defendant subjectively appreciated the risk. We are unpersuaded for two reasons: First, we agree with the *Flores* and *Rosenkrantz* courts that the terms "wanton disregard" and "for a base antisocial purpose" necessarily encompass an evaluation of the defendant's subjective state of mind.[4] Moreover, although the term "wanton" may not be common parlance, it is defined in CALJIC No. 16.840, and in the common law as involving an element of "consciousness of one's conduct" and "realization of the probable injury to another." (*Albers* v. *Shell Company* (1930) 104 Cal.App. 733, 750 [286 P. 752], disapproved on other grounds in *Meyer* v. *Blackman* (1963) 59 Cal.2d 668, 676 [31 Cal.Rptr. 36, 381 P.2d 916]; accord *People* v. *Schumacher* (1961) 194 Cal.App.2d 335, 340 [14 Cal.Rptr. 924]; *People* v. *McNutt* (1940) 40 Cal.App.2d Supp. 835, 837 [105 P.2d 657].) Second, appellant asks us to hold invalid a definition of malice specifically adopted by the California Supreme Court. As a court of intermediate appellate jurisdiction, we must follow the Supreme Court precedent. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

Although we find no error in giving the instruction itself, we recognize the possibility of error when, for example, the instruction is combined with arguments to the jury that the defendant could be found guilty of second degree murder even without subjective awareness of the risk to human life created by his conduct. No such arguments were made in this case. Although the prosecutor addressed both definitions of malice in his closing arguments, he stated that the elements of the conscious disregard definition are "shown in much the same way as the [wanton disregard] definition [of] implied malice." He then argued that even if the jury believed that while

---

[4] How can an individual wantonly *dis*regard a fact without having regarded it in the first instance?

appellant had the gun pointed at the victim it accidentally discharged when the victim grabbed the gun, "(s)till it shows a defendant who acted with a *conscious disregard* for life . . . all the facts show intentional conduct evidencing wanton disregard or conscious disregard for life." The prosecutor used the terms "conscious disregard" and "wanton disregard" interchangeably thereby reinforcing to the jury that an element of subjective awareness was involved regardless of which part of the implied malice instruction it applied. (See, e.g, *People* v. *James, supra,* 196 Cal.App.3d 272, 288-291 [no prejudicial error where prosecutor stated that there were two different implied malice definitions that were similar, and that the jury should find the defendant guilty if he acted with "conscious disregard for (the victim's) life"].)

## II., III.*

. . . . . . . . . . . . . . . . . . . .

## IV.  ADMISSIBILITY OF PRIOR INCONSISTENT STATEMENTS

Appellant also argues that the court erred in admitting appellant's July 4 pretrial statement to McMahon that Melinda had grabbed either at the gun or at appellant, causing the gun to fire accidentally. The court held that the July 4 statement showed consciousness of guilt because it was inconsistent with appellant's statements that Elaine grabbed the gun.[5] The court further held that the July 4 statement was inconsistent with Melinda's testimony that Melinda did not enter the room until after the third shot went off.[6] Appellant contends it was error to admit this statement because there were insufficient circumstantial indicia to support an inference of consciousness of guilt, and that it is error to give CALJIC No. 2.03 unless the statements given are inconsistent with the defendant's testimony at trial.

We find no error in the trial court's ruling. Appellant's argument that the July 4 statement could not support an inference of "fabrication . . . motivated by fear of detection" because it would be unreasonable of the appellant

---

* See footnote, *ante,* page 1223.

[5] These statements include her statement to Cavagna as she left Elaine's home that Elaine had grabbed the gun, her statement to the police at the time of her arrest that Elaine "grabbed the damn gun," and a taped statement to the police following her arrest that Elaine had grabbed the gun.

[6] McMahon also testified that Melinda entered the room at the same time he did, just after the third shot was fired. Cavagna testified to the same sequence of events.

to try to create a new fabrication after already making a statement to the police, is wholly without merit. The statement was clearly inconsistent with appellant's statement to the police and others that Elaine had grabbed the gun. Whether it was wise or rational for appellant to change her story is beside the point.

Appellant also argued in her opening brief that the statement was inadmissible because it was not inconsistent with her testimony at trial that Melinda shoved her from behind. In *People* v. *Kimble* (1988) 44 Cal.3d 480 [244 Cal.Rptr. 148, 749 P.2d 803], the appellant raised the identical argument. That court acknowledged that a series of Court of Appeal decisions, *People* v. *Thomas* (1979) 96 Cal.App.3d 507, 510-511 [158 Cal.Rptr. 120]; *People* v. *LaSalle* (1980) 103 Cal.App.3d 139, 152 [162 Cal.Rptr. 816]; *People* v. *Pic'l* (1981) 114 Cal.App.3d 824, 864-866 [171 Cal.Rptr. 106]; all emanating from *People* v. *Morgan* (1978) 87 Cal.App.3d 59, 68-69 [150 Cal.Rptr. 712], had concluded that "unless the falsity of the defendant's prior statement were established by his own testimony, it would be 'speculation of the rankest sort' to infer that the prior statement demonstrates a consciousness of guilt. . . ." (44 Cal.3d at pp. 497-498.) The court went on, however, to expressly disapprove these cases: "The logic of this reasoning excapes us. First, because the defendant's prior statement is not being introduced to prove the truth of the statement but simply to prove that the defendant made it, the jury can properly evaluate the evidence to determine if the prior statement was made, whether or not the defendant takes the stand. Second, although the fact that a defendant has—on the witness stand—contradicted a prior statement that he made relating to the crime provides *one* basis for the jury to determine that the earlier statement was false, it simply does not follow that the jury would necessarily be engaging in 'rank speculation' if it relied on other evidence to determine that the prior statement was false. In many cases, such other evidence—which may consist of physical evidence like fingerprints, or the testimony of trustworthy witnesses—will be equally, if not more, reliable than defendant's own in-court testimony. Of course, the jury need not believe the prosecution's evidence suggesting that the statement was false, and even if it finds that the statement was false, it need not conclude that defendant deliberately lied to hide his complicity in the crime. In brief, the question is one of weight, not admissibility. To the extent they are inconsistent with this conclusion, the decisions in *Morgan, Thomas, La Salle and Pic'l* (*see* fn. 12, *ante*) are disapproved." (*People* v. *Kimble, supra,* at p. 498.)

We therefore conclude that it was unnecessary to prove the statement's falsity by its inconsistency with appellant's testimony at trial. Instead, the falsity of the July 4 statement was demonstrated by the testimony of

McMahon, Cavagna, and Melinda. It was further demonstrated by its inconsistency with other statements made by appellant, including her statement to the police and Cavagna that Elaine had grabbed the gun.

Appellant also contends, in reliance on *People* v. *Rubio* (1977) 71 Cal.App.3d 757, 769 [139 Cal.Rptr. 750] and *People* v. *Green* (1980) 27 Cal.3d 1, 40-41 [164 Cal.Rptr. 1, 609 P.2d 468], that it was error to give CALJIC No. 2.03 because it unfairly singles out the defendant's testimony. In *Rubio,* the court stated that "The giving of CALJIC No. 2.03 is justified only if there exists evidence that defendant prefabricated a story to explain his conduct. This instruction is *not* applicable in the situation where a defendant makes an explanation of behavior to the police which is *consistent* with his self-serving testimony at trial that conflicts with the prosecution's evidence before the jury. In such a case, the instruction of necessity casts specific doubt on a defendant's credibility as a witness and singles out *defendant's testimony* as subject to more particular scrutiny than that attached to prosecution witnesses." (*People* v. *Rubio, supra,* 71 Cal.App.3d at p. 769; italics in original; disapproved on other grounds in *People* v. *Freeman* (1978) 22 Cal.3d 434, 438 [149 Cal.Rptr. 396, 584 P.2d 533].) In *Green,* the court, without approving or disapproving *Rubio,* stated that "[i]nasmuch as defendant did not testify in the case at bar, the harm identified in *Rubio* could not have flowed from the giving of the instruction." (*People* v. *Green, supra,* at p. 41.)

We doubt that *Rubio* survives the decision in *Kimble* because the *Rubio* court appeared to be following the reasoning of *Morgan* and its progeny. In any event, unlike *Rubio,* the prosecution did not rely solely on its own evidence to demonstrate the falsity of appellant's July 4 statement and her consciousness of guilt. The numerous conflicting stories given by appellant could fairly support the inference that they were all false and reflected a consciousness of guilt. (See *People* v. *Green, supra,* 27 Cal.3d 1, 41.)

V.   FAILURE TO POLL JURY REGARDING NEWSPAPER ARTICLE*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

---

* See footnote, *ante,* page 1223.

## CONCLUSION

The judgment is affirmed.

Racanelli, P. J., and Newsom, J., concurred.

A petition for a rehearing was denied June 22, 1989, and appellant's petition for review by the Supreme Court was denied August 10, 1989.