Filed 9/27/23  P. v. Armstrong CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E079698 |
| v. | (Super.Ct.No. SWF1502216) |
| CHEYENNE ARMSTRONG, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John D. Molloy, Judge.

Affirmed with modifications.

Stephen S. Lubliner, under appointment by the Court of Appeal, for Defendant

and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Alan

L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant, Cheyenne Armstrong, appeals from an order made following an evidentiary hearing conducted pursuant to Penal Code section 1170.95[1] [currently renumbered § 1172.6], at which the trial court vacated defendant's conviction for manslaughter (§ 192, subd. (a)), added an additional count to the information reflecting the target crime of assault with a deadly weapon in violation of section 245, subdivision (a)(1), found beyond a reasonable doubt that defendant was guilty of the target offense, resentenced defendant to three years in state prison already served, and terminated parole.

On appeal, defendant argues (1) the reduction of the crime of conviction to aggravated assault is not supported by the record, and (2) the trial court abused its discretion by imposing the middle term rather than the low term for the modified conviction. We affirm with directions.

## BACKGROUND

On December 15, 2015, victim Joey O'Donnell and his roommates had a gathering at their apartment where there was drinking and pot smoking. Most of the guests left between 10:00 p.m. and 11:00 p.m. Thereafter, O'Donnell, who shared a bedroom with William Webster, corresponded via Facebook with defendant Cheyenne Armstrong, whom he planned to meet outside the apartment. O'Donnell's roommate, Webster, saw the exchanges on the victim's computer, and knew defendant from high school. At some point, O'Donnell and Webster left the apartment to meet the defendant at the gate entrance to the apartments. They were in their underwear and had a blanket.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

There was no one at the first gate they reached, so they proceeded to the second gate where defendant had pulled up at approximately 2:00 a.m.; as O'Donnell opened the passenger door, Webster noticed that the passenger seat was fully reclined, as though someone had been in it. The group drove around the parking lot until they found a parking space at the rear of the lot and Cheyenne parked the vehicle. All three exited the vehicle, but before they headed for the apartment, Webster advised them to grab everything they needed so they did not need to return to the car. As they started towards the apartment, Cheyenne told them she forgot her purse in the car. Because O'Donnell and Webster were in their underwear and it was cold, O'Donnell told Webster to go on back to the apartment to get warm and that O'Donnell would accompany Cheyenne back to the car.

Webster returned to the apartment alone, but neither O'Donnell nor Armstrong showed up. After five or ten minutes had passed, Webster became worried and contacted Armstrong via Facebook Messenger at approximately 2:30 a.m. to find out where O'Donnell was. Armstrong responded that she did not know what happened, that someone ("some random guy") had punched her in the stomach and taken her purse and that O'Donnell had left. She further stated that she left the area after hearing a loud noise. Webster went looking for O'Donnell in the area around the location where Armstrong had parked her car but found nothing.

Webster contacted defendant via Facebook Messenger at 5:24 a.m. in efforts to find out where his roommate was. Later that morning, at approximately 7:45 a.m.,

3

Webster's landlord and his stepfather arrived at the apartment, at which time Webster was informed that O'Donnell's body had been found. A few minutes later (around 7:47 a.m.), Webster contacted defendant again to inform her that O'Donnell had died.

In the meantime, an investigation had begun at the apartment and Webster was interviewed, and thereafter defendant was contacted. Defendant gave various versions of the events. In the first version, defendant stated she went to the victim's apartment where Joey O'Donnell and Webster met her outside, they found a parking spot. As they walked from the car to the victim's apartment, defendant realized she had forgotten her purse, so she and Joey went back to the car while Joey's roommate, Webster, continued to the apartment. After they got her purse, she and Joey continued to the apartment, but she noticed her phone was dying, so she went back to the car for her charger. At that point, she and Joey were approached by an unknown male who was quite tall.[2]

The unknown male asked defendant for a lighter, which defendant provided to him. The man then handed the lighter to Joey and pushed Joey in the chest, at which point Joey took off running. Then the unknown man attempted to take defendant's purse, but she fought him off. The unknown male punched her in the stomach and then left.

Defendant then agreed to participate in a follow-up interview in San Bernardino, where there was a polygrapher. However, the polygrapher soon informed the investigator that defendant had changed her story. Defendant then began the second rendition of the events. In the second version, events started out much as they did in the first story, up to

---

[2] Defendant's boyfriend, Zachary Shumaker, is 6 feet, 7 inches tall.

the point where she had parked her car and the threesome started the walk to the apartment. In the second version, as they were walking, the victim became sexually aggressive with defendant, causing her to think the victim was acting up because his friend was there. Defendant asked O'Donnell to go back to her car for her purse, thinking he would stop acting up if he were away from his friend.

They retrieved the purse and started back toward the apartment, when she asked O'Donnell to come back to the car for her charger, although she wanted to leave. When they reached the car, she opened the passenger door to plug her phone into the charger, and took a folding knife from her purse, opened it, and put it into her sweater pocket. While her back was still to Joey, O'Donnell grabbed her by the hips from behind and thrust his hips against her. She turned around and pushed him away with her open hand while holding the knife in the other hand. Then she stabbed him and drove off, discarding the knife along the 215 freeway. At the conclusion of this interview, defendant was booked into jail on a murder charge.

Later, the investigator learned defendant wanted to speak to him again. The investigator then heard the third version of the events, in which defendant's boyfriend, Zachary Shumaker, stabbed O'Donnell, not she. In this version, the investigator learned that Zachary Shumaker was defendant's boyfriend, who had sent messages to a person named "Thad" in order to get a gun, and that messages between the two would show that Shumaker had planned it all out. Defendant informed the investigators Shumaker had

5

stated he was going to go after O'Donnell. Specifically, Shumaker told her that he would going to get "fucked up" and "do some fucked up shit."

In this third version, defendant denied Shumaker was with her when they left the motel where they were staying in Menifee, and she did not know how he got there. She described her movements: she left the motel and went alone to a Mexican restaurant where she purchased two burritos, from whence she proceeded to a McDonald's restaurant. She went to the McDonalds because she heard that her friend Thad (the same Thad who had been contacted by Shumaker about obtaining a gun) had overdosed. After calling around to find out where Thad was, she went on to Joey's apartment.

From there, some common elements of the three version emerged, that is, information about her going back to the car to get her purse on the way from the parking lot, but in this version, Shumaker was present at the car. Shumaker tried to give O'Donnell defendant's lighter, and then stabbed O'Donnell. Defendant and Shumaker then left. Before returning to the motel, they rinsed the knife off at a location on Scott Road. Back at the motel, Shumaker cut off pieces of his jacket that he had used to clean the knife.

The investigators checked surveillance videos at the Motel 6, where two people were seen entering defendant's car at the time defendant and Shumaker left to go to the victim's apartment. The video revealed that the person in the passenger seat was tall and leaning back, while the person driving was short. Surveillance cameras at the Mexican restaurant captured the images of both defendant and Shumaker at 12:23 a.m. The Motel

6

6 camera showed defendant's car returning, and two people exiting the vehicle at approximately 3:40 a.m.

Subsequent investigation led to the discovery of the knife used in the killing, which was found adjacent to or behind the Motel 6 in an embankment. Defendant (along with Zachary Shumaker) was charged by way of a first amended information with one count of murder (§187, subd. (a), count 1), along with a special circumstance allegation of lying in wait (§ 190.2, subd. (a)(15)), and a separate allegation of knife use against Shumaker only (§ 12022, subdivision (b)(1)).

On February 10, 2017, defendant entered into a plea agreement: pursuant to the plea bargain, the information was amended a second time (by interlineation) to add a new count charging manslaughter. (§ 192, subdivision (a), count 2.) After being arraigned on the amended information, defendant withdrew her not guilty plea and entered a plea of guilty to count 2, with a stipulated sentence of 11 years. Defendant's plea was accepted, and she was sentenced according to the terms of the agreement. In addition to the prison term, she was ordered to pay victim restitution in the amount of $2,855, and restitution fines and assessments. Defendant did not appeal from this conviction or challenge the victim restitution.

On February 3, 2022, defendant filed a petition for resentencing pursuant to (former) section 1170.95, alleging that she was not the killer, the complaint would have allowed the prosecution to proceed under a felony murder theory under the natural and probable consequences doctrine or other theory where malice is implied, and that she was

7

convicted of manslaughter accepting a plea offer in lieu of a trial at which she could have been convicted of murder or attempted murder, but that under current law she could not be convicted of murder or attempted murder. On April 15, 2022, the parties stipulated that the petition set forth a prima facie showing, giving rise to the issuance of an order to show cause why defendant should not be resentenced on April 15, 2022.

Prior to the hearing, the People submitted a brief for the order to show cause hearing to which the preliminary hearing transcript was appended. The defendant filed a response to which was attached "Exhibit A," a letter purportedly written by Zachary Shumaker to defendant's trial counsel.[3] On June 30, 2022, the court indicated it had read and considered all the filings, heard arguments of counsel, and took the matter under submission.

On July 13, 2022, the court granted the petition, found the People had not met its burden of proof beyond a reasonable doubt that defendant had aided and abetted a murder, and vacated the conviction. The court indicated the preliminary hearing transcript did not even establish that the victim died or that a murder was committed, because the evidence in the preliminary hearing indicated only that there was an altercation in the parking lot and that people told Webster his roommate was dead.

---

[3] This exhibit was admitted into evidence at the subsequent hearing on the order to show cause but was not in the original record on appeal because the exhibit was not found attached to the petition as indicated. After determining that the exhibit was neither in the court file nor in the court's exhibits, we requested that the assistance of the parties in locating the exhibit. Counsel for appellant was able to locate and lodge the exhibit with this court.

8

Because the People had not met their burden of proof beyond a reasonable doubt, the court found defendant not guilty of manslaughter.

People requested that the court reduce the charge to the target offense of aggravated assault. The court authorized additional briefing on the issue of whether defendant could be convicted of a target offense, within the meaning of section 1179.95, subdivision (e).

After additional briefing, the matter was again heard on August 30, 2022. Without considering the Proposition 115[4] evidence, and based solely on the defendant's own statements, the court found that the underlying offense was an assault with a deadly weapon. The court orally amended the information to add count 3, for aggravated assault, to conform with its findings. The court found beyond a reasonable doubt that defendant was guilty of violating section 245, subdivision (a)(1), a felony. Defendant was sentenced to the middle term of three years in prison with credit for time served and defendant's parole was terminated.[5]

On that same date, defendant appealed.

---

[4] Proposition 115 amended the provisions of section 872, with an effective date of January 1, 2006. That amendment permits the magistrate to hold a defendant to answer on criminal charges following a preliminary hearing at which "the finding of probable cause is based in whole or in part upon the sworn testimony of a law enforcement officer." (§ 872, subd. (b).)

[5] At the time of this hearing, defendant was released on parole.

DISCUSSION

1.      ***Whether the Record Supports a Conviction of Aggravated Assault.***

Defendant argues that there is insufficient evidence to support her conviction of the lesser offense of assault with a deadly weapon because the letter submitted by her boyfriend, Zachary Shumaker, which the trial court rejected as lacking credibility, completely exonerated her. We disagree.

a.      *Standard of Review*

The crux of defendant's argument is that there is insufficient evidence to support a finding that defendant was guilty of assault with a deadly weapon. However, defendant urges us to apply a de novo reviewing standard because the decision by the trial court was based solely on documentary evidence without live testimony. This is not the correct standard of review.

Whether the evidence presented is oral or documentary, when the correctness of a conviction is presented for review on appeal on the ground there is insufficient evidence to support it, we review for substantial evidence. Under this standard, we examine the entire record in the light most favorable to the judgment below. (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028.) We look for substantial evidence, which is evidence that is "reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078; *People v. Banks* (2015) 61 Cal.4th 788, 804), and we do not substitute our own factual determinations for the factfinder's. (*Koontz, supra*, at p. 1078).

Defendant's "appeal challenges the trial court's determination of a disputed factual issue, so we review the sufficiency of the evidence based on the familiar substantial evidence test." (*People v. Hernandez* (2009) 177 Cal.App.4th 1182, 1187, citing *People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

Defendant urges us to apply the de novo standard of review, but that standard is limited to situations in which the facts are undisputed and there remains only a question of law. (*People v. Whalen* (2013) 56 Cal.4th 1, 82 [disapproved of on a different point in *People v. Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17], citing *Hale v. Morgan* (1978) 22 Cal.3d 388, 394; see generally, 9 Witkin, Cal. Procedure (2023) Appeal, § 3429, p. 289.) When the decisive facts are undisputed, we are confronted with a question of law and are not bound by the findings of the trial court. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799.) But where the evidence is in conflict and the trier of fact has made findings, the appellate court will not disturb the verdict of the jury or the findings of the trial court. (*Id.,* at p. 799.) The question whether a defendant was armed with a deadly weapon during his or her current offense, or directly aided and abetted the assault with a deadly weapon by a principal, is a question of fact, and we see no reason to withhold the deference generally afforded to such factual findings. (*People v. Perez* (2018) 4 Cal.5th 1055, 1066.)

We note that the authorities relied upon by defendant (*People v. Vivar* (2021) 11 Cal.5th 510, 524-528 [record-based appeal of denial of motion to withdraw guilty plea under section 1473.7 due to inadequate advisement about immigration consequences] and

11

*People v. McKinnon* (2011) 52 Cal.4th 610, 647-648 [challenges for cause to jurors based solely on juror questionnaires]; *People v. Avila* (2006) 38 Cal.4th 491, 529 [same]; and *In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 [parole denials]), are all inapposite. In each case, the documentary evidence was not disputed, so the courts were faced with pure questions of law. That is not the situation before us.

"The standards of review for questions of pure fact and pure law are well developed and settled. Trial courts and juries are better situated to resolve questions of fact, while appellate courts are more competent to resolve questions of law. Traditionally, therefore, an appellate court reviews findings of fact under a deferential standard (substantial evidence under California law, clearly erroneous under federal law), but it reviews determinations of law under a non-deferential standard, which is independent or de novo review." (*People v. Cromer* (2001) 24 Cal.4th 889, 893-894, fn. omitted; see also, *People v. Aguilera* (2020) 50 Cal.App.5th 894, 908.) "The proper construction of section 1172.6 [former section 1170.95] subdivision (e) presents an issue of statutory interpretation that is subject to our de novo review." (*People v. Watson* (2021) 64 Cal.App.5th 474, 484; *People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.)

On the question of whether the record evidence supports the conviction for assault with a deadly weapon, the authorities cited in support of defendant's assertion that a different reviewing standard applied ignores the myriad decisions governing appellate review of a petition under section 1172.6. Case law uniformly holds that in an appeal from an order after the trial court holds a hearing pursuant to section 1172.6, subdivision

(d)(3), the appellate court reviews the trial court's findings to determine whether they are supported by substantial evidence. (See, *People v. Cooper* (2022) 77 Cal.App.5th 393, 412; *People v. Clements* (2022) 75 Cal.App.5th 276, 298; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 985; *People v. Williams* (2020) 57 Cal.App.5th 652, 663; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087.) We follow suit.

When a defendant challenges the sufficiency of the evidence to support the judgment, we "'"'"must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'"'" [Citation.]" (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)

Under the substantial evidence standard, "[w]e presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence." (*People v. Thomas* (2023) 14 Cal.5th 327, 377-378, citing *People v. Lindberg* (2008) 45 Cal.4th 1, 27.) "'"'"'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.'"'"'" [Citation.]" (*Thomas, supra*, at p. 377.) "A reviewing court neither reweighs [the] evidence nor reevaluates a witness's credibility." (*People v. Lindberg, supra*, 45 Cal.4th at p. 27.) Additionally, reversal is not warranted "'unless it appears "that upon no hypothesis

whatever is there sufficient substantial evidence to support [the conviction.]'"

[Citation.]" (*Thomas, supra,* p. 378.)

Here, defendant argues the court was bound to find her not guilty of any offense based on the letter submitted into evidence, written by her boyfriend and codefendant Zachary Shumaker. That evidence was found wholly incredible and was rejected by the trial court, creating a factual dispute that the court resolved against defendant. Relying as defendant does on evidence rejected by the trial court on grounds it was incredible, this case does not involve a pure question of law based on undisputed facts. Under these circumstances, this court is bound to apply the substantial evidence standard of review.

b. *Analysis*

Following an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3), if the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges. This triggers section 1172.6, subdivision (e), which states: "The petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes if the petitioner is entitled to relief pursuant to this section, murder or attempted murder was charged generically, and the target offense was not charged. Any applicable statute of limitations shall not be a bar to the court's redesignation of the offense for this purpose."

Section 1172.6 provides for a petitioner's resentencing by allowing the vacated conviction to be "redesignated as the target offense or underlying felony" under certain

circumstances.  (§ 1172.6, subd. (e); *People v. Arellano* (2022) 86 Cal.App.5th 418, 430 (*Arellano*).)  The section provides for a redesignation of the vacated murder conviction to the "target offense or underlying felony" if "murder was charged generically, and the target offense was not charged."  (§ 1172.6, subd. (e); *Arellano, supra*, 86 Cal.App.5th at p. 431.)  The plain language of section 1172.6, subdivision (e) contemplates a situation where an underlying felony was not charged.  (*People v. Howard* (2020) 50 Cal.App.5th 727, 738 [referring to § 1170.95, subd. (e)].)  "[T]he Legislature intended to grant the trial court flexibility when identifying the underlying felony for resentencing under subdivision (e)."  (*Id.*, at p. 739.)  "[A] resentencing court may redesignate a vacated murder [or manslaughter] conviction as a lesser offense commensurate with his or her participation in the underlying felony, not just generically, but with the petitioner's individual culpability in mind based on the evidence at trial."  (*People v. Silva* (2021) 72 Cal.App.5th 505, 519, citing *Howard, supra*, at pp. 738–740, 742; see also *People v. Gonzales* (2021) 65 Cal.App.5th 1167, 1174–1175.)

In the present case, the trial court, after reviewing the records and briefs submitted for consideration, and hearing arguments, concluded that from defendant's perspective, Shumaker intended only to beat up the victim, and she was unaware that murder would be committed.  Defendant's three diverse statements to investigators support the finding she knew Shumaker intended to confront the victim, and to "do some fucked up shit."  Giving defendant the benefit of the doubt, the trial court concluded at the close of the evidentiary hearing that she knew at the very least Shumaker intended to beat the victim,

and she was a major participant in transporting Shumaker to the apartment parking lot, where she was present for the stabbing with a knife, did nothing to prevent the stabbing, and aided Shumaker in the getaway and the disposition of the knife. On these facts, the court reasonably determined defendant directly aided and abetted an assault with a deadly weapon. As such, she was entitled to a downward modification but not an exoneration.

Defendant argues the court improperly discredited Shumaker's letter to defendant's counsel, in which he posited that defendant was coerced into her participation in the crime. We disagree. As the trier of fact, the court was required to make credibility determinations and to weigh the evidence in reaching its decision. (*People v. Lopez* (2018) 5 Cal.5th 339, 352; *People v. Jones* (2013) 57 Cal.4th 899, 963-964.) We are required to give deference to those findings. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.) In the letter, Shumaker made it plain he would not subject himself to confrontation or cross-examination about the matters mentioned in the letter, which the court properly considered, along with Shumaker's motive in wanting to help defendant, his girlfriend. We are not free to reweigh the evidence or to reconsider credibility determinations.

The credibility determination by the court was reasonable given other red flags provided in Shumaker's letter, including (1) going to a fast food restaurant to obtain information about a friend who, they had learned, was hospitalized; (2) the friend about whose health they were concerned was identified by defendant in her third statement as a person from whom Shumaker had arranged to purchase a gun; and (3) after calling

16

various hospitals, Shumaker decided to open defendant's phone, went to her Facebook page, and went to Joey's contact to set up a meet, making it look like defendant was contacting him. The incongruity of these actions makes it appear Shumaker was trying to make his version coincide with the evidence of the videos obtained during the investigation.

Shumaker's attempt to portray defendant as not knowing of his secret intent is belied by defendant's own statements that she knew he intended to "do some fucked up shit," that she told officers they would discover that Shumaker and Thad (the person from whom Shumaker wanted to obtain a gun and for whom defendant and Shumaker were searching in area hospitals) had planned the offense, and that she saw Shumaker push or shove the victim in the chest, contrary to Shumaker's statements that the killing was not planned and that defendant was unable to see the stabbing because she was standing behind him. Additionally, Shumaker indicated defendant's response to his desire to talk to Joey was to ask if he was going to hurt him and she warned Shumaker not to do anything stupid, demonstrating her suspicion he intended violence, especially after he had already asked her to take him somewhere so he could beat someone up. Moreover, Shumaker's letter does not explain why he reclined in the car seat to avoid being seen or how he entered the locked parking lot after defendant's car was given access, leaving him outside the locked compound.

The court's conclusion was reasonable and is supported by the record. Defendant directly aided and abetted Shumaker's assault with a deadly weapon.

2.    ***Whether the Court Abused Its Discretion By Not Imposing the Low Term for Defendant's Modified Conviction.***

Defendant argues the court abused its discretion by imposing the middle term for the reduced crime of assault with a deadly weapon, rather than the low term, due to her youth.  The People argue that the issue is moot because defendant's sentence was deemed served and her parole was terminated.  We agree the issue is moot, but also conclude the court did not abuse its discretion.

Section 1170, subdivision (b)(1), provides in part:  "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term."  Subdivision (b)(6) of section 1170 authorizes the court to order imposition of the lower term if certain contributing factors were present, including the fact "the person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense."  (§ 1170, subd. (b)(6)(B).)  According to section 1016.7, subdivision (b), "A 'youth' for purposes of this section includes any person under 26 years of age on the date the offense was committed."  Defendant, who was 19 at the time of the crime, was a youth within the meaning of section 1016.7, subdivision (b).

Section 1170, subdivision (b)(6), which went into effect January 1, 2022, "'establishes a presumption [that the court should impose] the lower term if the defendant's youth was "a contributing factor" in his or her commission of [a] crime "*unless* the court finds that the aggravating circumstances outweigh the mitigating

circumstances [such] that imposition of the lower term would be contrary to the interests of justice.'" (*People v. Fredrickson* (2023) 90 Cal.App.5th 984, 986-987, quoting *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.) However, the statute does not mandate a presumption in favor of the lower term in every case in which the defendant was under age 26 at the time the crime was committed. (*People v. Fredrickson, supra*, at p. 991; *People v. Flores, supra,* at p. 1039.)

"[T]he language and framework of the amended law makes clear the Legislature intended to maintain the sentencing court's discretion to impose the middle term even if it finds the defendant falls within one of the three categories of section 1170, subdivision (b)(6)." (*People v. Hilburn* (2023) 93 Cal.App.5th 189, 204.) "After a sufficient factual basis to support the circumstances in aggravation or mitigation is found, the court enjoys broad discretion in its sentencing determination. The trial courts sentencing decision is review[ed] for abuse of discretion.' [Citation.]" (*Id.,* at p. 205.) That "'discretion must be exercised in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based upon an "individualized consideration of the offense, the offender, and the public interest."' [Citation.]" (*Id*., at p. 206.)

In the present case, the court considered defendant's youth but found that factor was counter-balanced by the fact the victim died in imposing the midterm sentence, in exercising its discretion. The court considered all the evidence as well as the appropriate sentencing factors. There was no abuse of discretion.

3.    *Whether the Court Abused Its Discretion by Re-Imposing Victim Restitution.*

Defendant agreed to pay victim restitution as part of her original guilty plea, which was calculated at $2855.60.  At the resentencing hearing, defendant argued the restitution amount should be imposed against Shumaker, not defendant.  She argues the trial court abused its discretion by re-imposing victim restitution because her offense was redesignated as a non-homicide offense.  We disagree.

Section 1202.4, subdivision (f), provides that "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court."  The use of the word "shall" indicates that the imposition of direct victim restitution is not discretionary; it is mandatory.

"Section 1202.4 implements the state constitutional mandate that 'all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer.' [Citation.]"  (*People v. Evans* (2019) 39 Cal.App.5th 771, 777, quoting *People v Giordano* (2007) 42 Cal.4th 644, 652 (*Giordano*); *People v. Mearns* (2002) 97 Cal.App.4th 493, 498.)  While a victim restitution order may also serve the purposes of rehabilitation and deterrence (*People v. Bernal* (2002) 101 Cal.App.4th 155, 161–162; *People v. Moser* (1996) 50 Cal.App.4th 130, 135–136), its measure is the harm suffered

by crime victims and its primary effect is to compensate those victims. This effect is reinforced by the requirement that all moneys collected from a defendant be first applied to victim restitution. (Cal. Const., art. I, § 28, subd. (b)(13)(C).)

Victim restitution is mandatory. (*People v. Seymour* (2015) 239 Cal.App.4th 1418, 1435; *People v. Kleinman* (2004) 123 Cal.App.4th 1476, 1479–1480.) However, the trial court has broad discretion in setting the amount of restitution, although it must employ a rational method for calculating the amount of restitution. (*People v. Baker* (2005) 126 Cal.App.4th 463, 467; *Giordano*, *supra*, 42 Cal.4th at pp. 663-664.) Thus, a trial court's order is reviewed for abuse of discretion. (*People v. Akins* (2005) 128 Cal.App.4th 1376, 1382 (*Akins*).)

There is no abuse of discretion even where the amount awarded "does not represent the exact amount of the loss, nor must the order reflect the amount of damages recoverable in a civil action. [Citation.]" (*Akins, supra*, 128 Cal.App.4th at p. 1382.)

The statute's reference to losses incurred due to a defendant's "conduct" means the mandatory imposition of direct victim restitution applies in any case where a defendant's criminal conduct results in economic loss to a victim, or the survivors of a victim. It is not limited to homicide cases. In the present case, defendant agreed to pay the very modest restitution as part of her plea agreement and did not challenge the amount recommended by the probation department.

While defendant's conviction was reduced following the resentencing procedure, it is not vacated. She remains convicted of a crime and her conduct led to the economic

loss sustained by the victim's family. There was no showing that the amount of restitution was unreasonable, and, given that the losses were attributed to defendant's criminal conduct, there was no abuse of discretion in re-imposing the originally agreed-upon amount.

4. ***Whether the Abstract of Judgment Requires Correction.***

Defendant argues the trial court corrected the amount of conduct credits awarded for her presentence time spent in local custody (§ 4019) but failed to award credit for her time spent in prison of 1935 days. The People agree that she spent the time in prison but argue that the issue is moot because she is released from prison and is not on parole. We will direct that the abstract of judgment be corrected.

"The trial court is generally required to include all aspects of a judgment in its oral pronouncement of judgment." (*People v. Leon* (2020) 8 Cal.5th 831, 855, citing *People v. Mesa* (1975) 14 Cal.3d 466, 471.) "Any discrepancy between the judgment as orally pronounced and as recorded in the clerk's minutes or abstract of judgment is presumed to be the result of clerical error." (*Mesa, supra,* at p. 471.) "The abstract of judgment 'does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize.' [Citation.]" (*Leon, supra,* at p. 855.)

It is unclear whether defendant is ineligible for compensation under section 4900, et sequitur, because she was convicted of a lesser crime, and was not found factually innocent of any crime. (See § 4903, subd. (a) [requiring proof that the crime with which the defendant was charged was either not committed at all, or, if committed, was not

22

committed by the claimant, and the injury sustained by them through their erroneous conviction and incarceration].)

Where a person is eligible for compensation, section 4900 provides that a person erroneously convicted and imprisoned for a felony may present a claim to the Board for injuries sustained thereby. The claim must be based on grounds the crime was "not committed at all, or, if committed, was not committed by" the claimant. (§ 4900; see also *Diola v. State Board of Control* (1982) 135 Cal.App.3d 580, 584.) The meaning of the term "innocent" as used in section 4900, subdivision (a), has been interpreted to mean that the claimant can show that he or she did not commit acts that constitute the elements of the charged crime. (*Ebberts v. State Board of Control* (1978) 84 Cal.App.3d 329, 335; *Diola, supra*, at p. 588.) Thus, a person whose conviction was reduced to a lesser crime after the person had served a lengthy term is not considered "innocent." (See *People v. Etheridge* (2015) 241 Cal.App.4th 800, 810.)

But there are other provisions under the California Code of Regulations that might apply in defendant's situation (see Cal. Code Regs., tit. 2, § 640), among other potential claims. We are not called upon to determine the merits of any such claim; we simply recognize that there may be merit to directing the lower court to correct the abstract of judgment.

## DISPOSITION

The judgment is affirmed as modified.  The clerk of the court is directed to prepare an amended abstract of judgment reflecting that defendant serve 1935 actual days in state prison.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ          
P. J.

We concur:

FIELDS          
J.

RAPHAEL          
J.